Carol Sue HARDING, Wallace
E. Harding and Cheryl A.
Scull, Plaintiffs,

v.

DANA TRANSPORT, INC. and Robert
Partridge, Defendants.

Civ. A. No. 94–4261(JEI).

United States District Court,
D. New Jersey.

Jan. 25, 1996.

Stephen G. Console, Diane L. Newman, Law Offices of Stephen G. Console, Haddon Heights, New Jersey, for Plaintiffs, Carol Sue Harding, Wallace E. Harding and Cheryl A. Scull.

Steven M. Berlin, Giordano, Halleran & Ciesla, P.C., Middletown, New Jersey, for Defendant, Dana Transport, Inc.

Lawrence P. Engrissei, Law Offices of Thomas Dempster, III, Mt. Laurel, New Jersey, for Defendant, Robert Partridge.

### OPINION

ROSEN, United States Magistrate Judge:

Presently before the court is the motion of Steven M. Berlin, Esquire, counsel for Defendant Dana Transport, Inc. (hereinafter "Dana"), for a protective order preventing or in the alternative limiting the deposition of William J. Bowe pursuant to Rule 26(c), Fed. R.Civ.P.[1] After careful consideration of the parties' submissions, and after further consideration of the oral argument conducted on November 3, 1995, and for the reasons noted below, the defendant's motion shall be *granted in part* and *denied in part*.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs Carol Sue Harding and Cheryl A. Scull brought this sexual discrimination action against Dana, their employer, and one of its supervisors, Robert Partridge, for acts and omissions alleged to have taken place beginning in January 1993 and continuing until both plaintiffs terminated their employment.[2] Dana hired Ms. Harding in June 1991 as a secretary/bookkeeper at Dana's Paulsboro, New Jersey, facility. (Complaint, ¶ 21). Dana hired Ms. Scull in November 1992 as a billing bookkeeper at the same facility. (Complaint, ¶ 25). Robert Partridge joined Dana as General Manager of the Paulsboro facility in September or October of 1992. (Complaint, ¶ 22). On August 31, 1994, plaintiffs filed suit alleging violations under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (hereinafter "Title VII"), the New Jersey Law Against Discrimination N.J.S.A. § 10:5–1, et seq. (hereinafter "NJLAD"). In addition, plaintiffs Carol Sue and Wallace Harding alleged separate causes of action for defamation. Jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1367.

Prior to commencing suit in federal court, in September 1993 Ms. Harding filed a complaint with the New Jersey Division on Civil Rights (hereinafter "NJDCR"), the agency charged with enforcement of the NJLAD. *See* N.J.S.A. 10:5–6, 5–30. In December 1993, Ms. Scull filed a similar complaint against Dana. The complaints alleged that both Ms. Harding and Ms. Scull were subjected to sexual intimidation, harassment and discrimination by Mr. Partridge, conduct which Dana failed to prevent, address or take corrective measures. (*See* NJDCR Complaints of Carol S. Harding and Cheryl A. Schull attached as Ex. A and Ex. B to the Supplemental Affidavit of William J. Bowe) (hereinafter "Bowe Supp.Aff."). In February and June 1994 respectively, the NJDCR held fact-finding conferences to determine the propriety of Ms. Harding's and Ms. Scull's claims. The plaintiffs maintain, and Dana does not contest, that Dana "defended its position [during the NJDCR inquiry] in

---

1. By letter dated October 25, 1995, Lawrence P. Engrissei, Esquire, counsel for Defendant Robert Partridge, notified this Court that Mr. Partridge joins in Dana's motion.

2. Ms. Scull resigned on approximately October 29, 1993 and Ms. Harding resigned on approximately January 20, 1994. (Compl. ¶ 36, 37). Ms. Harding's husband also claims injury from

his association with Dana. He claims "pain and suffering, embarrassment, humiliation, emotional anguish, loss of enjoyment of life's pleasures and other losses" at the hand of—or more precisely the words of—Defendant Partridge. (Compl. ¶¶ 34, 44, 67). Mr. Harding's defamation claim is not relevant to the present motion.

part on the grounds that it had conducted an appropriate investigation of [the plaintiffs'] allegations." (Plaintiff's Brief at 2–3 (hereinafter "Pls.' Br."); *see also,* Dana Transport, Inc. Position Statement attached as Ex. 1 to Pls.' Br. at 5; Dana's Responses to Plaintiffs' Interrogatories attached as Ex. 2 to Pls.' Br.).

The issue presently before the court concerns the propriety of a deposition of William J. Bowe, Dana's attorney during the initial stages of the dispute. Mr. Bowe is a shareholder in the law firm of Giordano, Halleran & Ciesla, P.C. (hereinafter "GH & C"). Dana retained GH & C in November of 1993 in response to Ms. Harding's NJDCR discrimination complaint. (Affidavit of William J. Bowe, ¶ 3) (hereinafter "Bowe Aff."). Mr. Bowe was in charge of handling Dana's defense in the administrative action before the NJDCR.[3]

The plaintiffs seek to inquire into an investigation conducted by Mr. Bowe at the behest of his client, Dana. (Defendant Dana Transport, Inc.'s Brief at 5) (hereinafter "Dana's Br."). According to Dana, the investigation was conducted "in preparation of an anticipated Fact Finding Conference to be held by the NJDCR and in anticipation of further litigation." (*Id.*). The investigation consisted of conferences with Dana's President, Ron Dana; Controller, Robert H. Moogan; Paulsboro Transport Manager, Timothy Schultz; and Paulsboro Shop Manager, Robert Partridge. (Bowe Aff. ¶ 5). Dana asserts that "[t]he purpose of the investigation was to determine the factual bases, if any, of Harding's complaint with the Division and to assess the strengths, if any, and weaknesses of Harding's charges and to recommend, if appropriate, remedial measures and a legal defense strategy/settlement posture based upon his findings." (Dana's Br. at 5; Bowe Aff. ¶ 6).

Dana utilized the results of Mr. Bowe's investigation in three ways. First, Dana prepared a position statement for submission to the NJDCR at the fact finding conference. (Pls.' Br.Ex. 1). Second, Dana's counsel postulated a defense strategy with regard to Ms. Harding's and Ms. Scull's administrative complaints, which strategy Dana intended to use in any future litigation. (Dana's Br. at 6). Third, Dana formulated a written sexual harassment policy. (*Id.*). Significantly, part of Dana's defense strategy included reliance upon the reasonableness of Dana's actions in response to the plaintiffs' charges. In its position statement to the NJDCR, Dana asserts that it has "fully investigated the complaints raised in the Verified Complaint and has found that there is no supporting evidence that the same occurred." (Dana Transport, Inc. Position Statement attached as Ex. 1 to Pls.' Br. at 5). Moreover, with respect to the present suit, Dana has represented to this court that it intends to defend liability based in part upon Mr. Bowe's investigation. (*See* Letter of Steven M. Berlin, Esq., dated October 26, 1995 at 5) (hereinafter "Berlin 10/26 Letter").

Based upon Dana's reliance on the Bowe investigation, counsel for the plaintiffs inquired into the substance of Mr. Bowe's investigation during the deposition of Mr. Moogan. (Berlin Aff. ¶ 5–6). Although Mr. Berlin allowed superficial inquiry into the fact that an investigation was conducted, he objected to any inquiry into the substance of that investigation on the grounds of the attorney/client privilege. (Berlin Aff. ¶ 6; *see also* Moogan Deposition Tr. attached as Ex. A to Berlin Aff. at 20–21).

As a result of Mr. Berlin's objection during the Moogan deposition, on August 17, 1995, plaintiffs' counsel noticed Mr. Bowe for deposition. To the notice plaintiffs attached a request for production of the following documents:

1. Any and all documents, letters, memos, handwritten notes and/or tapes that refer to, relate to or evidence any investigation, questioning of witnesses or conversations pertaining to allegations of sexual harassment or misconduct of Dana Transport, Inc., and Robert Partridge;

2. Any and all time sheets and billing records that refer to, relate to or evi-

---

**3.** Steven M. Berlin, Esquire, also a shareholder at GH & C, is in charge of handling the matter filed with this court. (Affidavit of Steven M. Berlin, ¶ 4) (hereinafter "Berlin Aff.").

dence actual time spent by deponent in investigating the issues referred to above; and

3. Any and all correspondence between Dana Transport, Inc., and deponent pertaining to the investigation to be conducted, or previously conducted, by deponent (excluding, by appropriate redaction, if necessary, any and all communications between Dana and deponent that pertain to legal opinions and legal advice being sought or provided by deponent).

(*See* Deposition Notice and Document Request attached as Ex. 5 to Pls.' Br.). Mr. Berlin timely objected to both the deposition and the document request. This motion followed.

## II. DISCUSSION

The defendants advance four arguments in support of preventing or limiting a deposition of attorney William J. Bowe. They base their first argument on rules of privilege, evoking both work product doctrine and the attorney/client privilege. Second, they argue for non-disclosure by analogizing Mr. Bowe's investigation materials, thoughts and impressions to "self-critical analysis" which courts have protected as privileged. The defendants base their third argument on the public policy underlying the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, et seq. Finally, the defendants argue that, even if this court does not find privilege, the plaintiffs' discovery request is unduly burdensome and oppressive.

As no court has been asked to assess the discoverability of investigative materials obtained by counsel in sexual discrimination cases founded on allegations of hostile work environment, this court is faced with a case of first impression.

### A. PRIVILEGE DOCTRINES

■ The defendants argue that the request for materials and access to Mr. Bowe

should be proscribed because the substance of communication by and with him is protected from discovery by the attorney/client privilege and work product protection doctrines. The plaintiffs offer two arguments in opposition to Dana's position. First, the plaintiffs argue that Mr. Bowe was not acting as an attorney when he conducted interviews of Mr. Partridge and other Dana employees in connection with Dana's investigation into Harding and Scull's allegations. Nor was Mr. Bowe acting as an attorney when he prepared any documentation as a result of those interviews. Second, the plaintiffs contend that Dana, by asserting the investigation as part of its defense, has waived any privilege. (Pls.' Br. at 7). In contravention to discovery, Dana argues that the court should consider the "chilling effect" a ruling permitting discovery would have on attorney/client communications, and requests "no discovery be had regarding any aspect of Bowe's investigation."[4] (Dana's Br. at 1).

■ Although intertwined, work product protection and attorney/client privilege are independent principles intended to protect litigants from unfettered disclosure. *See United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1975) (citing *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947)). The Federal Rules of Civil Procedure allow parties to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ... if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Rule 26(c) of the Federal Rules of Civil Procedure codifies the court's authority to protect privileged information from disclosure. *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986). A party or person seeking to obtain a protective order on the basis of an asserted privilege bears

---

**4.** It is significant to note that this district recognizes that "there is no general prohibition against obtaining the deposition of adverse counsel regarding relevant, non-privileged information." *Johnston Development Group, Inc. v. Car-*

*penters Local Union No. 1578,* 130 F.R.D. 348, 352 (D.N.J.1990). Moreover, where the attorney's conduct itself is the basis of a claim or defense, the attorney may generally be examined as any other witness. *Id.*

the burden of establishing the applicability of a privilege to the information sought. *In re Bevill, Bresler & Schulman, Inc.*, 805 F.2d 120, 126 (3d Cir.1986); *Grand Jury Empanelled February 14, 1978*, 603 F.2d 469, 474 (3d Cir.1979).

■ The privileges referred to in Rule 26(b)(1) are those privileges embodied in Rule 501 of the Federal Rules of Evidence. Rule 501 states that the scope and application of any claimed privilege is governed by the common law, unless otherwise provided by the Constitution or federal statute.[5] In cases premised upon federal question jurisdiction, federal common law governs the evidentiary privileges, rather than state law. *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 671 F.2d 100, 103 (3d Cir.1982); *Wei v. Bodner*, 127 F.R.D. 91, 94 (D.N.J. 1989). Moreover, "[w]here, as here, there are both federal and state law claims, federal privileges rather than state privileges apply to all claims." *Wei v. Bodner*, 127 F.R.D. at 94. Accordingly, federal common law shall govern those claims premised upon federal question jurisdiction as well as those premised upon state law.

### 1. ATTORNEY–CLIENT PRIVILEGE

The United States Supreme Court examined the application of the attorney-client privilege in the corporate context in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Recognizing the attorney-client privilege as the "oldest of the privileges for confidential communications known to the common law," the Court reflected that its purpose is:

> to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves

public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Id.* at 389, 101 S.Ct. at 682; *see also Rhone–Poulenc Rorer Inc. v. Home Indemnity Co.*, 32 F.3d 851, 862 (3d Cir.1994); *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir.1979) ("the attorney-client privilege exists to foster disclosure and communication between the attorney and the client"). The Court also recognized that although the artificial nature of a corporation creates complications in the application of the privilege, the privilege applies equally when the client is a corporation. *Upjohn*, 449 U.S. at 389–390, 101 S.Ct. at 682–83. The Court was careful to indicate that no bright-line rule governs the applicability of the attorney-client privilege. *Id.* at 396–97, 101 S.Ct. at 686. Rather, courts should determine the applicability of the privilege on a case-by-case basis. *Id.* (citing S.Rep. No. 93–1277, p. 13 (1974) U.S.Code Cong. & Admin.News 1974 pp. 7051, 7059).

■ The Third Circuit has enumerated the traditional elements of the privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

5. Fed.R.Evid. 501 states in pertinent part:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the

United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

*In re Grand Jury Investigation,* 599 F.2d at 1233 (citing *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)); *see also Rhone–Poulenc,* 32 F.3d at 862 (citing 8 Wigmore, Evidence, § 2292, at 554 (J. McNaughton rev. 1961)); *Acuri v. Trump Taj Mahal Assoc.,* 154 F.R.D. 97, 101–102 (D.N.J.1994). Courts have found that "because the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Grand Jury Investigation,* 599 F.2d at 1245; *see also United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983) ("[T]he scope of the privilege should be 'strictly confined within the narrowest possible limits.'") (quoting 8 Wigmore, Evidence § 2291 (McNaughton rev. 1961)). Strict construction of the privilege has the additional benefit of increased predictability—for a privilege beset by uncertainty is no privilege at all. *See Upjohn,* 449 U.S. at 393, 101 S.Ct. at 684. *See also Rhone–Poulenc,* 32 F.3d at 863.

The plaintiffs argue that the attorney-client privilege does not protect the requested discovery on two grounds. First, the plaintiffs assert that Mr. Bowe's investigation did not constitute a communication in which he was "acting as a lawyer." Second, the plaintiffs posit that Dana, by asserting the investigation as part of its defense, has waived any attorney-client privilege which may have existed.

### a. Acting As An Attorney for the Purposes of the Attorney–Client Privilege

■ The plaintiffs maintain that Mr. Bowe "was not acting as an attorney when he conducted interviews of Partridge and other Dana employees in connection with Dana's investigation into Harding and Scull's allegations." (Pls.' Br. at 8). Rather, they assert, Mr. Bowe was acting as a fact finder or investigator, and that legal acumen was not required or utilized when he conducted the interviews. (*Id.*). The court does not find this argument persuasive as this view overlooks Supreme Court teaching that:

> the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice. [citations omitted] The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant.

*Upjohn,* 449 U.S. at 390, 101 S.Ct. at 683.[6] In *Upjohn,* the Court confronted the complexities of corporate representation. The Court noted that having a corporation as a client necessitates obtaining factual information from a number of individuals within that corporation. *Id.* at 391, 101 S.Ct. at 683. Thus, an attorney who interviews various individuals within a corporation may do so with the intent to enhance client representation.

Dana retained GH & C in November 1993, a full three months after Ms. Harding had filed her complaint with the NJDCR. (Berlin Aff. ¶ 2). GH & C entered its appearance as attorneys for Dana in both plaintiffs' administrative actions. (Bowe Aff. ¶¶ 8 & 9). Mr. Bowe indicates that he conducted the investigation at Dana Transport, Inc. in furtherance of his representation of Dana. (Bowe Aff. ¶ 6). This court has been provided with no information which contradicts Mr. Bowe's assertion. Mr. Bowe's investigation clearly falls within the purview of attorney activity. Consequently, the court finds that Mr. Bowe was acting as an attorney for the purposes of the attorney-client privilege.

### b. Waiver of the Attorney–Client Privilege

Mr. Bowe's investigation, and all the documents he prepared in connection therewith, will be protected from discovery so long as "the privilege has been (a) claimed and (b)

---

**6.** The Court relied in part upon American Bar Association ("ABA") Code of Professional Conduct 4–1 which instructs that a lawyer "should be fully informed of all the facts of the matter he is handling," and should utilize his legal training to determine that which is relevant or irrelevant. *Id.* Although the ABA no longer relies upon the Code of Professional Conduct to define ethical obligations of attorneys, the substance of Code 4–1 has been incorporated in Model Rule of Professional Conduct 1.6. The ABA adopted the Model Rules of Professional Conduct in 1983.

not waived by the client." *In re Grand Jury Investigation,* 599 F.2d at 1233. The defendants have claimed the attorney-client privilege. The challenge before this court is to determine whether the defendants have waived that which they so clearly and unequivocally claim.

Although privileges often provide categorical protection, common law doctrines exist which give courts a limited ability to ensure that privileges do not serve ends for which they were not intended. *See In re Sealed Case,* 676 F.2d 793, 807 (D.C.Cir.1982). One such doctrine is *waiver,* which can be either express or implied. According to federal common law, the doctrine of implied waiver concerns an abuse of a privilege itself rather than of a privileged relationship. *Id.* Explaining, the court opined: "Where society has subordinated its interest in the search for truth in favor of allowing certain information to remain confidential, it need not allow that confidentiality to be used as a tool for manipulation of the truth-seeking process." *Id.* Quoting Dean Wigmore, the court continued:

> regard must be had to the double elements that are predicated in every waiver, i.e., not only the element of implied intention, but also the element of fairness and consistency. A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.

*Id.* quoting 8 J. Wigmore, Evidence in Trials at Common Law § 2327 at 636.

◼ Before applying the fairness doctrine, the court notes the unique treatment of the doctrine in the Third Circuit. The Third Circuit has recognized two distinct types of limited waiver: partial and selective. *Westinghouse v. Republic of the Philippines,* 951

F.2d 1414, 1423 n. 7 (3d Cir.1991). Parties selectively disclose privileged communication when they reveal information to one party and not another. Parties engage in partial disclosure when they reveal only segments of privileged communication. "Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications." *Id.*

While the Third Circuit does not apply the fairness doctrine to situations of selective waiver, it has recognized the validity of the District of Columbia Circuit's fairness rationale in partial disclosure cases. *Westinghouse v. Republic of the Philippines,* 951 F.2d at 1426–27.[7] The present case involves partial waiver. Dana has not disclosed the information to any adversary. Rather, Dana offers only a superficial glance at certain information, attempting to maintain the secrecy of the remainder. As the Third Circuit applies the fairness doctrine in cases involving partial disclosure, fairness is a central element of this court's determination of waiver of the attorney-client privilege.

The defendants assert that because Mr. Bowe conducted his interviews "at the behest of Dana's instruction for the purposes of preparing an answer to the allegations of sexual harassment and in anticipation of further litigation" (Dana's Br. at 11), the information should be protected by the attorney-client privilege. However, the defendants concede that Mr. Bowe's function was not limited to investigation of ongoing litigation. They state that:

> [f]irst, he conducted interviews in anticipation of litigation and in preparation of Dana's defense posture with the Division. Second, he conducted the investigation to assess the strength, if any, and the weaknesses of Harding's and Scull's allegations, and to propose subsequent remedial mea-

---

7. Although *Westinghouse* concerned an exclusively selective waiver situation, therein the court first formally enunciated the distinction between partial and selective disclosure. In so doing, the

court adopted the District of Columbia Circuit's reasoning for cases involving partial waiver. *Id.* at 1426–27, 1430.

sures which Dana could undertake in the future to better prepare itself for other possible similar allegations in the future. (Dana's Br. at 17). By Dana's own assertion, Mr. Bowe's task encompassed investigation, analysis, reporting and remediation. Furthermore, Dana's *use* of Mr. Bowe's services was not limited to preparation for pending litigation. Dana also utilized Mr. Bowe's investigation and counsel to formulate a written sexual harassment policy. (Dana's Br. at 6). However, the use which most strongly suggests the possibility of waiver of the attorney-client privilege is Dana's reliance upon the investigation as a defense to employer liability under Title VII and the NJLAD.

The plaintiffs assert that Dana has used the investigation as a defense during the administrative proceedings. The record supports this assertion. In its Position Statement to the NJDCR, Dana asserts that it has "fully investigated the complaints raised in the Verified Complaint and has found that there is no supporting evidence that the same occurred." (Dana Transport, Inc. Position Statement attached as Ex. 1 to Pls.' Br. at 5). Moreover, with respect to the present suit, Dana has represented to this court that it intends to defend liability based in part upon Mr. Bowe's investigation. Dana's eleventh separate defense states that "[t]he defendants acted on reasonable grounds and without malice, and, therefore, are not responsible to the plaintiffs for any alleged damages." (Answer at 11). Mr. Berlin, Dana's counsel, describes this intention rather vaguely:

> Dana is not submitting any of the specifics of Bowe's investigation as a basis of defense in this matter. Dana merely intends to offer the fact that Bowe did conduct an investigation as part of his representation of Dana in response to allegations filed with the Division on Civil Rights. Whether this investigation, coupled with other actions taken on behalf of Dana in the context of the facts in this case, constitutes evidence of reasonable conduct on the part of Dana is a jury question, but does not compel disclosure of the specifics of Bowe's investigation.

(*See* Berlin 10/26 Letter at 5). Dana seeks to limit exposure of the specifics of the investigation by asserting that it relies only on the *fact* of the investigation as a defense. (*Id.*). However, neither federal court nor New Jersey state court jurisprudence support Dana's position.

■■■ Title VII provides recovery for plaintiffs who rely upon the "hostile or offensive work environment" theory of liability for sexual harassment, stating:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e–2. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990); *Steiner v. Showboat Operating Company,* 25 F.3d 1459, 1462 (9th Cir.1994); *Giordano v. William Paterson College of New Jersey,* 804 F.Supp. 637, 641 (D.N.J.1992). To bring an actionable claim for sexual harassment because of an intimidating and offensive work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." *Andrews,* 895 F.2d at 1482 (quoting *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir. 1989), *cert. denied,* —— U.S. ——, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995)). In *Andrews,* the Third Circuit held that a successful claim of sexual harassment based upon a hostile work environment under Title VII requires the presence of five constituents:

> (1) the employees suffered intentional discrimination because of their sex; (footnote omitted) (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that

position; and (5) the existence of respondeat superior liability. *Id.* Whether waiver of the attorney-client privilege exists here depends upon federal court interpretation of the fifth constituent.

 The Supreme Court has directed courts to apply agency principles when determining whether liability has been established against an employer. *Meritor,* 477 U.S. at 73, 106 S.Ct. at 2408; *Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 106 (3d Cir.1994). According to these principles " 'liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action.' " *Andrews,* 895 F.2d at 1486 (quoting *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989)); *see also Giordano v. William Paterson College,* 804 F.Supp. at 643. As the Supreme Court instructed in *Upjohn,* a corporation's knowledge depends upon the knowledge of those within a broad "control-group" which may include middle-level or even lower-level employees.[8] 449 U.S. at 391, 101 S.Ct. at 683. Further, "if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable." *Id.* (citing *Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983)). Finally, if the employer's supervisory personnel "manifested unmistakable acquiescence in or approval of the harassment, the burden on the employer seeking to avoid liability is especially high." *Id.* However, an employer may avoid liability if its procedures for investigating and remediating alleged discrimination are sufficiently effective. *Bouton,* 29 F.3d at 107.

 When determining the adequacy and effectiveness of an employer's response to a hostile environment claim, courts have considered "whether the employer investigated the alleged acts of harassment and *the type of investigation the employer conducted."* *Giordano,* 804 F.Supp. at 643 (emphasis supplied). *See also Steiner v. Showboat Operating Co.,* 25 F.3d at 1464. In *Giordano,* the court considered the formality of the investigation, and had before it the report of the investigator. *Id.* In *Steiner,* the court considered evidence which allowed the court to conclude that the defendant may not have seriously investigated the charges of discrimination. 25 F.3d at 1464. The court in *Bouton* was also aware of the content of internal investigations. 29 F.3d at 107, n. 5 (noting what the investigation revealed).

 Dana provides the *fact* of an investigation while seeking to prohibit any probing into its substance. During the Moogan deposition, counsel for the plaintiff attempted to discover what questions Mr. Bowe asked Mr. Moogan. Mr. Moogan is Dana's Controller, a management-level employee, through whom the plaintiffs sought to determine the extent of Dana's knowledge in order to meet the requirements of a Title VII claim. *See Andrews,* 895 F.2d at 1482. However, Mr. Berlin objected to Mr. Moogan answering "any questions pertaining to conversations he had with Mr. Bowe referring to Mr. Bowe's investigations of the complaint of discrimination." (Berlin Aff.Ex. A at 21:1–4). Without such information, the plaintiffs cannot determine the seriousness of Dana's investigation into the plaintiffs' allegations of sexual harassment.

However, the present case adds a complexity not present in either *Steiner, Giordano* or *Bouton:* Mr. Bowe acted as Dana's attorney as well as its investigator. Dana retained Mr. Bowe as its attorney to defend it against specific allegations of discrimination. As an appropriate part of his preparation (*see Upjohn,* 449 U.S. at 391, 101 S.Ct. at 683), Mr. Bowe conducted the investigation at issue.

---

8. In extending the scope of the control-group concept from upper management to potentially all employees, the Court recognized that

> [i]n the corporate context, ... it will frequently be employees beyond the ... officers and agents ... responsible for directing the company's actions in response to legal advice who possess the information needed by the corporation's lawyers. Middle-level—and indeed lower-level—employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.

*Upjohn,* 449 U.S. at 391, 101 S.Ct. at 683.

The defendants would like this court's inquiry to end there. However, as mentioned before, Dana's use of its attorney's investigation compels this court to continue.

The Third Circuit addressed a similar issue in *Glenmede Trust Company v. Thompson*, 56 F.3d 476 (3d Cir.1995). The court denied the defendant, Glenmede Trust Company, appeal of a district court order compelling Glenmede's law firm, Pepper Hamilton & Scheetz ("Pepper Hamilton"), to comply with a subpoena duces tecum requesting its file relating to all work it performed for Glenmede Trust regarding the repurchase transaction. *Glenmede* involved a shares repurchase or "buy-back" transaction. Glenmede Trust served as a trustee for the defendant, the Pew Charitable Trusts ("the Pew"), and as an investment advisor for the plaintiffs, the Thompson family ("Thompson"). Both Thompson and the Pew held substantial shares of Oryx Energy Company stock. Glenmede arranged a profitable buy-back transaction of Oryx stock for the Pew which it did not extend to Thompson. Before completing the transaction, Glenmede consulted its attorney as to whether it could extend the Oryx transaction to its investory clients. The firm issued an Opinion Letter advising Glenmede that "it could not notify its private clients of the buy-back negotiations between Oryx and Glenmede acting in its capacity as trustee of the Pew Charitable Trusts." *Id.* at 479. Glenmede then excluded its private clients with holdings of Oryx stock from the buy-back transaction "allegedly, based on the Opinion Letter from Pepper, Hamilton." *Id.*

The *Glenmede* plaintiffs maintained that Glenmede's reliance on the Opinion Letter placed the legal representation at issue. Consequently, the plaintiffs sought disclosure of the firm's entire file concerning any and all services performed for Glenmede in connection with the buy-back transaction, including documents underlying the Opinion Letter. Glenmede and its firm objected to the production on the basis of the attorney-client privilege. The Third Circuit affirmed the district court's ruling that "Pepper Hamilton's involvement in structuring and closing the transaction required the production of back-up documents to the Opinion Letter *to permit the Thompson family to analyze the reasonableness of Glenmede's reliance on the advice of counsel.*" *Id.* at 480. The court reasoned that the defendants should not be permitted to define the scope of their own waiver of the attorney-client privilege stating:

> There is an inherent risk in permitting the party asserting a defense of its reliance on advice of counsel to define the parameters of the waiver of the attorney-client privilege as to that advice. That party should not be permitted to define selectively the subject matter of the advice of counsel on which it relied in order to limit the scope of the waiver of the attorney-client privilege and therefore the scope of discovery. To do so would undermine the very purpose behind the exception to the attorney-client privilege at issue here—fairness.
>
> The party opposing the defense of reliance on advice of counsel must be able to test what information had been conveyed by the client to counsel and vice-versa regarding that advice—whether counsel was provided with all material facts in rendering their advice, whether counsel gave a well-informed opinion and whether that advice was heeded by the client.

*Id.* at 486; *see also Bierman v. Marcus*, 122 F.Supp. 250, 252 (D.N.J.1954) (in deciding whether the attorney-client privilege is waived, "the most important consideration is fairness. He (the client) cannot be allowed after disclosing as much as he pleases, to withhold the remainder"). The court found that Glenmede had placed in issue advice related to the structure of the stock repurchase transaction. Accordingly, the court found that Glenmede Trust had waived the attorney-client privilege as to all communications, both written and oral, to or from counsel as to the entire transaction. *Glenmede*, 56 F.3d at 487.

Two other cases further illuminate the applicability of waiver in the present suit. The District Court for the Northern District of California came to a similar conclusion in *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 929 (N.D.Cal.1976). In that patent action, the court found that "[b]y putting their lawyers on the witness stand in

order to demonstrate that the prior lawsuits were pursued on the basis of competent legal advice and were, therefore, brought in good faith, defendants will waive the attorney-client privilege as to communications relating to the issue of the good-faith prosecution of the patent action." *Id.* The court affirmed its earlier order to disclose all relevant records, opinion letters, interviews of witnesses, internal files, memoranda and notes which pertained to the validity of the attorney's assertions at issue. *Id.* at 928. In another analogous situation, the District Court for the Southern District of New York concluded that the defendant had brought privileged information into issue in an action for breach of contract. *Garfinkle v. Arcata National Corp.,* 64 F.R.D. 688 (S.D.N.Y.1974). The defendant asserted that it did not fulfill one element of the contract for sale of stock pursuant to the advice of its counsel—counsel advised the defendant that it need not register the stock although the contract provided that the defendant would. *Id.* at 689. The court found that although the documents relating to the attorney's advice were clearly protected by the attorney-client privilege, "that privilege may be waived if the privileged communication is injected as an issue in the case by the party which enjoys its protection." *Id.* The defendant was willing to provide the Opinion Letter to the plaintiff but no underlying documents or information. However, the court found that the plaintiff was entitled to know how the opinion letter came into being: the defendant must not be permitted to "use the letter as both a sword and a shield." *Id.* Consequently, the court ordered that all documents relating to the advice be disclosed.

Dana argues that it did not assert reliance on the advice of counsel as an affirmative defense. Rather, Dana maintains that it "merely intends to offer the fact that Bowe did conduct an investigation as part of his representation of Dana in response to allegations filed with the Division on Civil Rights." (Berlin 10/26 Letter at 5). The defendants rely upon the Third Circuit decision of *Rhone–Poulenc Rorer Inc. v. Home Indem-*

*nity Company,* 32 F.3d 851 (3d Cir.1994). However, the defendants' reliance is misplaced. In *Glenmede,* the court limited its decision in *Rhone–Poulenc* to the facts of the case. The court opined that "our holding in [*Rhone–Poulenc* ]—that a party does not lose the privilege to protect attorney-client communications from disclosure in discovery when his or her state of mind is placed at issue—was premised upon the unique facts of that case. (citation omitted) In *Rhone–Poulenc,* advice of counsel was not raised as an affirmative defense nor were there any acts evincing a clear intent to waive the attorney-client privilege by placing at issue reliance on the advice of counsel." 56 F.3d at 486.

Discovery of the content of the investigation is relevant to much more than the state of mind of Dana. Rather, the investigation, itself, provides a defense to liability. As previously reviewed, Title VII permits employer liability which employers may refute by proving that they reasonably and sufficiently investigated the allegations of discrimination. *Andrews,* 895 F.2d at 1482. Dana has attempted to utilize the results of Mr. Bowe's investigation both as a defense to liability under Title VII and as an aspect of its preparation for the sexual discrimination trial itself. By asking Mr. Bowe to serve multiple duties, the defendants have fused the roles of internal investigator and legal advisor. Consequently, Dana cannot now argue that its own process is shielded from discovery. Consistent with the doctrine of fairness, the plaintiffs must be permitted to probe the substance of Dana's alleged investigation to determine its sufficiency. Without having evidence of the actual content of the investigation, neither the plaintiffs nor the fact-finder at trial can discern its adequacy. Consequently, this court finds that Dana has waived its attorney-client privilege with respect to the content of Mr. Bowe's investigation of the plaintiffs' allegations. This waiver extends to documents which may have been produced by Mr. Bowe or any agent of Defendant Dana that concern the investigation.[9] However, before this court can order

9. Dana also argued initially that the court must give consideration to confidentiality promised to each interviewed employee. Dana states in its

brief that "[a] reasonable expectation of privacy existed on the part of all participants in the investigation throughout the entire course of the

disclosure, it must address the defendants' other arguments, any one of which can provide for protection from disclosure.

## 2. WORK PRODUCT DOCTRINE

 The work product doctrine provides an independent basis upon which litigants may rely for protection of an attorney's trial preparation thoughts and materials. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The purposes and protection of the work product doctrine differ from those underlying the attorney-client privilege. The attorney-client privilege exists to keep inviolate confidences of clients to their attorneys, thereby presumably enhancing the communication exchange. The work product doctrine, however, seeks to enhance the quality of professionalism within the legal field by preventing attorneys from benefitting from the fruit of an adversary's labor. The timeless and oft cited statements of Mr. Justice Murphy in *Hickman v. Taylor* elucidate the fundamentals of the work product doctrine:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and in-

tangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman,* 329 U.S. at 511, 67 S.Ct. at 393–94. This doctrine has been codified as to tangible items in Rule 26(b)(3), Fed.R.Civ.P. which states in pertinent part:

> a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Fed.R.Civ.P. 26(b)(3); *see also* Advisory Committee Notes, 1970 Comment to Fed.R.Civ.P. 26(b)(3). The Supreme Court has described the doctrine as an "intensely practical one, grounded in the realities of litiga-

---

investigation." (Dana's Br. at 5). Issues of confidentiality are an important element of the fairness doctrine. *See, In re Subpoenas Duces Tecum,* 738 F.2d at 1372. However, Mr. Bowe later clarified that the confidentiality expected by the employees was far more limited. Mr. Bowe states in his supplemental affidavit that he "ex-

pressly advised each of [the employees] that GH & C was counsel for Dana, and that each employee had the right to retain separate counsel of his own choice[.]" (Bowe Supp.Aff. ¶ 6). Therefore, the only promise of confidentiality concerns Dana and its general rights under the attorney-client privilege.

tion in our adversary system." *U.S. v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). As reflected both at federal common law and in the Federal Rules, the work product doctrine provides qualified not absolute protection. *Id.* at 239, 95 S.Ct. at 2170. And, "like other qualified privileges, it may be waived." *Id.*

▮ The defendants assert that the plaintiffs have not and cannot meet the stringent standards for disclosure required under *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The statements elicited by Mr. Bowe from Dana's employees were oral. Consequently, any and all written material was prepared by Mr. Bowe as Dana's attorney. As in *Upjohn,* any notes or memoranda Mr. Bowe might have prepared are work product based upon oral statements. And, "if they reveal communications, they are ... protected by the attorney-client privilege. To the extent they do not reveal communications, they reveal the attorneys' mental processes in evaluating the communications. *As Rule 26 and Hickman make clear, such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship." Upjohn,* 449 U.S. at 401, 101 S.Ct. at 688 (emphasis supplied).

However, the plaintiffs need not rely upon this means of overcoming work product protection. Since *Upjohn,* the federal courts have recognized that litigants need not make the "extraordinary showing of necessity that would be required to remove the work product privilege under *Hickman* and *Upjohn." In re Sealed Case,* 676 F.2d 793, 811 (D.C.Cir.1982); *see also Westinghouse v. Republic of the Philippines,* 951 F.2d 1414, 1428–31 (3d Cir.1991). Rather, litigants may ground their objections to a claim of work product protection in the doctrine of *implied waiver. Id.* In *Sealed Case,* the court considered the discoverability of opinion work product. *Sealed Case* involved a corporation which elected to participate in a Securities and Exchange Commission ("SEC") volun-

tary disclosure program. The corporation, after submitting a report to the SEC during an informal preliminary investigation, attempted to shield the documents underlying the report from discovery in a later grand jury investigation. The court noted that the party seeking discovery did not attempt to make a showing of necessity. Rather than requiring such a showing, the court opined that the documents "need not be produced *unless the ... implied waiver doctrine[ ] appl[ies]." In re Sealed Case,* 676 F.2d at 811. The corporation argued that it made a conditional disclosure to the SEC which, under the "limited waiver" doctrine, did not waive its privilege as to the underlying documents. 676 F.2d at 801–805, 822–823. The court rejected the limited waiver theory as an "unnecessary expansion" of the work product doctrine. *Id.* at 823.[10] The court ordered the opinion work product disclosed.

*Upjohn* did not involve an instance of *implied waiver.* Moreover, the Court has not yet spoken on the interrelation between the doctrine of implied waiver and the work product doctrine contained in *Hickman* and Rule 26. Thus, this court will conduct its inquiry in accordance with Third Circuit jurisprudence considering the application of the doctrine of implied waiver.

*Sealed Case* involved application of implied waiver to a criminal investigation, with the extensive powers of the grand jury. *Sealed Case,* 676 F.2d at 823. Federal courts have since extended the scope of the implied waiver doctrine to civil suits. In *In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1371 (D.C.Cir. 1984), the court adopted the *Sealed Case* reasoning. The court posited that litigants must not manipulate the work product doctrine for their own benefit by attempting to selectively disclose their attorney's work product. The court relied upon considerations of fairness and consistency to prohibit litigants from gaining "the substantial advantages accruing to voluntary disclosure of work product to one adversary ... while

---

**10.** The court noted that the doctrine of "limited waiver" advanced in *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 611 (8th Cir.1977) (en banc), in the context of the attorney-client privilege was rejected "as an unnecessary expansion

of the attorney-client privilege in *Permian Corp. v. United States,* 665 F.2d 1214, 1220–22 (D.C.Cir.1981)." *Sealed Case,* 676 F.2d at 823; *see also Westinghouse,* 951 F.2d at 1423.

being able to maintain another advantage inherent in protecting that same work product from other adversaries." *Id.* at 1371–72. Finally, in *Westinghouse v. Republic of the Philippines*, 951 F.2d 1414, 1428–30 (3d Cir. 1991), the court held that, in light of the "general principle that evidentiary privileges are to be strictly construed" and the recognition of qualified rather than absolute privilege, "the standard for waiving the work product doctrine should be no more stringent than the standard for waiving the attorney-client privilege." *Id.*

Applying these principles to the present case, this court finds that Dana has impliedly waived the protection provided by the work product doctrine. Dana attempts to defend employer liability under Title VII based in part upon its investigation of the plaintiffs' claims. *See* 17–22. Its investigation consists of Mr. Bowe's interviews and the reporting of Mr. Bowe's interviews to Dana's management. The fact that Mr. Bowe acted simultaneously as Dana's attorney does not change the significance of Dana's placing the investigation at issue by asserting the affirmative defense. Principles of fairness and consistency require that Dana produce all of the underlying documentation. It would be fundamentally unfair for the plaintiffs to be required to meet an element of their *prima facie* case without sufficient information regarding the factual substance of that element. Justice requires that the plaintiffs be permitted to respond to the defenses asserted with a full spectrum of information. Dana may not withhold essential information with regard to its internal investigation.

That Dana chose to enlist its attorney to act with dual purpose does not provide sufficient basis to overcome the unfairness of limiting the information it provides. As the *Westinghouse* court observed, "attorneys are still free to prepare their cases without fear of disclosure to an adversary as long as they and their clients refrain from making such disclosures themselves." 951 F.2d at 1429. Significantly, the holding of this court provides a great degree of predictability (*see Upjohn*, 449 U.S. at 393, 101 S.Ct. at 684) as it was the actions of Dana and its attorney that require disclosure. Corporate litigants hoping to counter charges of respondeat superior liability may easily avoid this result in the future either by separating the role of investigator from that of litigator, or by refraining from defending themselves on the basis of reasonable investigation. Furthermore, disclosure also will support public policy considerations which seek to eradicate discrimination. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1483 (3d Cir.1990). Corporations which heretofore have attempted to cloak their investigations of allegations of discrimination with secrecy will be forced to unveil their remedial processes and procedures.

Requiring disclosure may also engender economic benefit. The knowledge that investigations of discrimination claims—investigations used to provide the basis for a defense of employer liability—are discoverable may encourage employers to investigate early. Rather than postponing investigation until litigation is imminent and having their attorney conduct the initial investigation, employers may develop efficient and thorough procedures addressing allegations immediately. These procedures will not involve the added expense of legal fees. The efficiency of the procedures will lead to swift resolution; and any complaints not resolved will have been developed which will simplify preparation for litigation.

## B. SELF–CRITICAL ANALYSIS

The defendants also assert that the privilege of self-critical analysis protects from discovery the information concerning the investigation of Mr. Bowe. Federal courts first recognized the privilege of self-critical analysis in *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249, 251 (D.D.C.1970), *aff'd*, 479 F.2d 920 (D.C.Cir.1973). *See also U.S. v. Dexter Corp.*, 132 F.R.D. 8, 9 (D.Conn.1990). The *Bredice* court held that, absent evidence of extraordinary circumstances, a hospital has a qualified privilege to retain the minutes and reports of medical staff meetings during which doctors critically analyzed the hospital's medical care. *Id.* The court in *Bredice* recognized "the privilege based on the propo-

sition that '[t]he public interest may be a reason for not permitting inquiry into particular matters by discovery.'" *Id.* (quoting *Bredice,* 50 F.R.D. at 250–51).

The self-critical analysis privilege has also been recognized in a variety of actions in which confidentiality is "essential to the free flow of information and ... the free flow of information is essential to promote recognized public interests." Note, *The Privilege of Self–Critical Analysis,* 96 Harv.L.Rev. 1083, 1087 (1983); *see Dexter,* 132 F.R.D. at 9 (citing cases). While the Third Circuit has yet to rule on this issue, this court in *Todd v. South Jersey Hosp. System,* 152 F.R.D. 676 (D.N.J.1993), has recognized the existence of the self-critical analysis privilege. *See also Orsatti v. New Jersey State Police, et al.,* No. 91–3023 (D.N.J. filed March 30, 1994) and *Wei v. Bodner,* 127 F.R.D. 91 (D.N.J.1989).

 In *Todd,* I stated that "[w]hile this privilege has been recognized in some circumstances, it is not absolute. Where the need for this information is substantial and disclosure would have little effect on self-analysis, discovery has been compelled. The purpose for the existence of the privilege must at all times be kept in mind when evaluating its application: the critical self-analysis privilege exists entirely as a public policy concern; it is not personal to the holder. Thus, the privilege may be punctured by a showing of particularized need that outweighs the public interest in confidentiality." 152 F.R.D. at 683.

 Accordingly, in *Todd,* based on recent case law interpreting the self-critical analysis privilege I outlined a balancing test to determine whether a party has made the required showing under the privilege. Specifically, courts must balance:

(1) the extent to which the information may be available from other sources; (2) the degree of harm that the litigant will suffer from it's unavailability; and (3) the possible prejudice to the agency's investigation.

*Id.* (quoting *McClain v. College Hospital,* 99 N.J. 346, 359, 492 A.2d 991 (1985)). Furthermore, in *Wei v. Bodner,* the court also recognized that the self-critical analysis privilege

may be overcome by applying a balancing test: "if the need for the privilege is outweighed by the federal interests, then the privilege must fall." 127 F.R.D. at 101.

 The defendants cite *Banks v. Lockheed–Georgia Company,* 53 F.R.D. 283 (N.D.Ga.1971), for the proposition that the investigation is protected from discovery as frank self-criticism and evaluation in the development of programs designed to eradicate employment discrimination and hostile work environments. *See* 53 F.R.D. at 285. However, the United States District Court for the Eastern District of Pennsylvania came to the opposite conclusion. *Webb v. Westinghouse Elec. Corp.,* 81 F.R.D. 431 (E.D.Pa.1978). Reviewing policy considerations, the *Webb* court recognized the argument that "if subjective materials constituting 'self-critical analysis' are subject to disclosure during discovery, this disclosure would tend to have a 'chilling effect' on an employer's voluntary compliance with equal employment opportunity laws." Nevertheless, the court recognized that countervailing logic necessitated careful limitation of situations in which self-critical analysis may be raised:

federal equal employment opportunity laws manifest a strong policy in favor of eradicating all vestiges of employment discrimination due to race, sex, or national origin. In furtherance of this policy, plaintiffs must be permitted to obtain information sufficient to enable them to prove employment discrimination where such discrimination exists. To the extent that the defense of 'self-critical analysis' conflicts with a plaintiff's ability to gather information necessary to prove his or her case, the recognition of such a defense hampers the enforcement of federal equal employment laws.

81 F.R.D. at 433. The court suggested some boundaries may be helpful to advance the relevant public policy considerations:

First, materials protected have generally been those prepared for *mandatory governmental reports.* Second, only subjective, evaluative materials have been protected; objective data contained in those same reports in no case have been protected. Finally, courts have been sensitive to

the need of the plaintiffs for such materials, and have denied discovery only where the policy favoring exclusion of the materials clearly outweighed plaintiff's need.

81 F.R.D. at 434.

Further, the defendants' reliance upon *Banks* is misplaced. *Banks* dealt with a company's evaluation of its affirmative action initiatives. Lockheed had appointed an internal review team to "study the company's problems in the area of equal employment opportunities, and to determine the progress, if any, of the company's Affirmative Action Compliance Programs." *Id.* at 284. This was a generalized report which reviewed the company's overall record—not just a review of an individual complaint. The *Banks* plaintiffs sought the notes and memoranda underlying the report. These documents necessarily included review of various instances of possible discriminatory conduct by the company unrelated to the conduct complained of by the plaintiff. The plaintiffs before this court do not seek discovery of a generalized company review. Rather, as the defendants have conceded, the investigation concerned only those allegations related to the plaintiffs' complaints.[11]

## C. PUBLIC POLICY UNDER THE NEW JERSEY LAW AGAINST DISCRIMINATION

 Finally, Dana argues that public policy under the New Jersey Law Against Discrimination requires protection of the requested information. The defendants rely upon *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445 (1993), for justification of the confidentiality of the investigation. (Defs.' Br. at 16–17). Dana argues that the New Jersey Supreme Court "requires that employers encourage victims to come forward to report incidents of harassment by providing effective policies to report sexual harassment." *Id.* However, Dana misreads *Lehmann.* Like the present case, *Lehmann* concerned allegations of hostile work environment against the defendant, Toys 'R' Us. In *Lehmann*, the court announced a new test

for a plaintiff to meet his or her *prima facie* burden in a sexual discrimination case based upon allegations of hostile work environment:

> To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment.

132 N.J. at 603, 626 A.2d 445. On the subject of the employer's obligations, the court opined: "We cannot overstate the importance we place on a test that allows employees to know their rights in a given set of circumstances and that *allows employers to set policies and procedures that comply with that test.*" *Id.* (emphasis added). In other words, *Lehmann* does not stand for the proposition that employers *must* conduct investigations. Rather, *Lehmann* attempted to clarify conduct which our system considers wrongful, thereby enabling employers to more easily conform their conduct to the law.

In reference to employer liability, the court in *Lehmann* discussed the 1990 amendment of the NJLAD which now provides that "all remedies available in common law tort actions shall be available to prevailing plaintiffs" in Superior Court actions. *Id.* at 616 (citing N.J.S.A. 10:5–13). The court held that employers would be strictly liable for equitable relief in cases of supervisory harassment (*Id.*), liable on agency principles for compensatory damages (*Id.* at 618, 626 A.2d 445), and liable for punitive damages "only in the event of actual participation by upper management or willful indifference" (*Id.* at 625, 626 A.2d 445). The court's primary concern was the "position which provides the most effective intervention and prevention of employment discrimination." *Id.* The defendants assert that allowing a plaintiff to inquire into the substance of a company's investigation would have a "chilling effect" on the effectiveness of future in-

---

11. The fact that the company also utilized information gained from Mr. Bowe's interviews to develop a written sexual discrimination policy does not alter the limited factual investigation conducted by Dana.

vestigations. As discussed *supra*,[12] the mere disclosure of the materials and communications connected with Mr. Bowe's investigation will not dampen the spirit of reform. Rather, full review of a company's investigatory process will encourage persons suffering from acts of discrimination to come forward. Further, exposing and remedying conduct which a company considers discriminatory will serve to educate employees and supervisors regarding acceptable and unacceptable conduct.

### D. DISCLOSURE IS OVERBROAD AND UNDULY BURDENSOME

■ Broad-based, non-specific objections are almost impossible to assess on their merits, and fall woefully short of the burden that must be borne by a party making an objection to an interrogatory or document request. *See, e.g., Roesberg v. Johns–Manville Corp.,* 85 F.R.D. 292 (E.D.Pa.1980). An objection to an interrogatory or document request must state with specificity the objection and how it relates to the particular request being opposed, and not merely that it is "overly broad and burdensome" or "oppressive" or "vexatious" or "not reasonably calculated to lead to the discovery of admissible evidence":

> To voice a successful objection to an interrogatory [the objecting party] cannot simply intone this familiar litany. Rather, [it] must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive ... The burden [is upon] the party resisting discovery to clarify and explain its objections and to provide support therefor.

*Roesberg v. Johns–Manville Corp.,* 85 F.R.D. at 296–97; *Trabon Engineering Corp. v. Eaton Manufacturing Co.,* 37 F.R.D. 51, 54 (N.D.Ohio 1964). *See also Gulf Oil Corp. v. Schlesinger,* 465 F.Supp. 913 (W.D.Pa.1979); *In re Folding Carton Antitrust Litigation,* 83 F.R.D. 260 (N.D.Ill.1979); *Robinson v. Magovern,* 83 F.R.D. 79 (E.D.Pa.1979); *Flour Mills of America, Inc. v. Pace,* 75 F.R.D. 676 (E.D.Okla.1977); *Klausen v. Sidney Printing & Publishing Co.,* 271 F.Supp.

783 (D.Kan.1967); 8 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2173 (1970; 1993 Suppl.).

Objections "must be specific and be supported by a detailed explanation why the interrogatories are improper." *United States v. 58.16 Acres of Land,* 66 F.R.D. 570, 572 (E.D.Ill.1975). The federal courts have held time and again that "[g]eneral objections are not proper [and] without more [are] an insufficient basis for refusal to answer." *Schaap v. Executive Industries, Inc.,* 130 F.R.D. 384, 386, 388–89 (N.D.Ill.1990). Further, it is the "obligation of the [objecting party] to object with particularity so that the court can ascertain the objectionable character of the discovery request." *Schaap,* 130 F.R.D. at 388. Failure to meet this obligation "may result in waiver of the objections." *In re Folding Carton Antitrust Litigation,* 83 F.R.D. at 264; *White v. Beloginis,* 53 F.R.D. 480, 481 (S.D.N.Y.1971). "In light of the broad construction given to discovery requests, [the objecting party has] a heavy burden to show why discovery should be denied." *Id.* at 389, *citing Blankenship v. Hearst Corp.,* 519 F.2d 418, 429 (9th Cir. 1975).

■ In support of the allegations of burden and oppression, the defendants assert two arguments. First, they merely reiterate that the information requested is protected by privilege doctrines discussed above. (Dana's Br. at 24–25). As this court has found that Dana has waived its privilege with respect to the documents and communications which comprise Mr. Bowe's investigation, that argument provides no basis upon which to assert undue burden or oppression. Second, the defendants argue that to depose their trial attorney would be intrusive and would undermine the adversarial process. (*Id.* at 25–26). However, "there is no general prohibition against obtaining the deposition of adverse counsel regarding relevant, non-privileged information." *Johnston Development Group, Inc. v. Carpenters Local Union No. 1578,* 130 F.R.D. 348, 352 (D.N.J. 1990). The court further recognized that "[i]n cases where the attorney's conduct itself

---

**12.** See section II, B, *supra*.

is the basis of a claim or defense, there is little doubt that the attorney may be examined as any other witness." *Id.*

Although the *Johnston* court concerned non-privileged information, it is logical to apply the principle to information for which privilege has been waived. By placing the investigation at issue, deposition testimony from Mr. Bowe becomes highly relevant and necessary to the plaintiffs' *prima facie* burden. The plaintiffs require details of the substance of the alleged reasonable investigation of the plaintiffs' claims of discrimination. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482–1486 (3d Cir.1990); *Lehmann v. Toys 'R' Us,* 132 N.J. 587, 618 and 625, 626 A.2d 445 (1993). Therefore, the court does not find that the discovery allowed, which is specifically set forth below, represents an undue burden.

### III. CONCLUSION

Mr. Bowe conducted an investigation, at the behest of his client Dana Transport, Inc., of allegations of discrimination which were the subject of a pending administrative proceeding and which Dana anticipated would be the subject of further litigation. The court finds that the substance of this investigation falls within the confines of the attorney-client privilege and the work product doctrine. However, for the reasons noted above, the court finds that Dana has waived its right to assert privilege by affirmatively inserting the issue of the investigation into the litigation.

Therefore, consistent with the principles and privileges reviewed *supra,* Mr. Bowe shall submit to a deposition which shall probe the substance of the investigation which Mr. Bowe conducted for Dana upon which Dana relies for the affirmative defense of reasonableness.[13] Moreover, Dana shall produce the following documents requested by the plaintiffs:

1. Any and all documents, letters, memos, handwritten notes and/or tapes that refer to, relate to or evidence any investigation—including communications obtained by questioning of witnesses or conversations pertaining to allegations of sexual harassment or misconduct of Dana Transport, Inc., and Robert Partridge;

2. Any and all time sheets and billing records that refer to, relate to or evidence actual time spent by deponent in investigating the issues referred to above; but Mr. Bowe may redact the time sheets and billing records in so far as they do not concern the investigation, and Mr. Bowe need not reveal financial information; and

3. Any and all correspondence between Dana Transport, Inc., and deponent pertaining to the investigation to be conducted, or previously conducted, by deponent (excluding, by appropriate redaction, if necessary, any and all communications between Dana and deponent that pertain to legal opinions and legal advice being sought or provided by deponent which do not relate to the company's reaction to the investigation).

Any document to be produced may be redacted if it concerns information not relevant to the scope and nature of the investigation.

An appropriate order shall enter this date.

### ORDER

This matter having been brought before the court upon the motion of Steven M. Berlin, Esquire, counsel for Defendant Dana Transport, Inc., for a protective order preventing or in the alternative limiting the deposition of William J. Bowe pursuant to Rule 26(c), Fed.R.Civ.P.; and the court having considered the submissions of the parties; and the court having further considered oral argument conducted on November 3, 1995; and for the reasons noted in the opinion entered on this date;

---

13. The court does not rule today that Mr. Bowe must reveal every aspect of his professional association with Dana—only those aspects which reveal to the plaintiffs the nature and scope of the investigation. The purpose of the court's ruling is not to force an attorney to bestow upon his adversary the result of his labor or the private thoughts of his client. Rather, the court merely requires a party to fairly support its assertions and permit its adversary a fair opportunity to contest:

IT IS this 25th day of January, 1996 hereby

**ORDERED** that the defendant's motion for a protective order shall be **DENIED IN PART** and **GRANTED IN PART**; and

IT IS FURTHER **ORDERED** that Ms. Bowe shall submit to a deposition by the fourteenth day of February 1996 on the limited subject of the investigation which he conducted for Dana Transport, Inc. and upon which Dana Transport bases its assertion of "reasonable investigation" of Harding and Scull's allegations; and

IT IS FURTHER **ORDERED** that by the sixteenth day of February, 1996, the Dana shall provide the following information:

1. Any and all documents, letters, memos, handwritten notes and/or tapes that refer to, relate to or evidence any investigation—including communications obtained by questioning of witnesses or conversations pertaining to allegations of sexual harassment or misconduct of Dana Transport, Inc., and Robert Partridge;

2. Any and all time sheets and billing records that refer to, relate to or evidence actual time spent by deponent in investigating the issues referred to above; but Mr. Bowe may redact the time sheets and billing records in so far as they do not concern the investigation, and Mr. Bowe need not reveal financial information; and

3. Any and all correspondence between Dana Transport, Inc., and deponent pertaining to the investigation to be conducted, or previously conducted, by deponent (excluding, by appropriate redaction, if necessary, any and all communications between Dana and deponent that pertain to legal opinions and legal advice being sought or provided by deponent which do not relate to the company's reaction to the investigation); and

IT IS FURTHER **ORDERED** that by the sixteenth day of February, 1996, Mr. Moogan shall be re-deposed on the limited issue of the substance of the investigation conducted by Dana Transport, Inc., including communication he had with Mr. Bowe in connection with the investigation.