Marie **GIORDANO**, Plaintiff,

v.

**WILLIAM PATERSON COLLEGE of NEW JERSEY**, Defendant.

**Civ. A. No. 89–5081.**

United States District Court,
D. New Jersey.

Oct. 23, 1992.

Marie Giordano, pro se.

Robert J. Del Tufo, Atty. Gen. of N.J. by Barbara M. Kleva, Trenton, N.J., for defendant.

## OPINION

WOLIN, District Judge.

Plaintiff, Marie Giordano ("Giordano"), brings this Title VII suit against defendant, William Paterson College of New Jersey (the "College"), based on charges of sexual discrimination. The alleged violations include termination of employment and sexual harassment by male co-workers including Sergeant Robert Jackson ("Jackson"), Acting Chief Peter Ryerson, ("Ryerson") and Lieutenant Michael Seaman ("Seaman"). For consideration before the Court is defendant's motion for summary judgment, which is decided on the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons expressed below, the Court will grant defendants' motion in part and deny defendant's motion in part.

## BACKGROUND

A. *Giordano's Work History*

Giordano worked as a campus police dispatcher at the College from April 27, 1985

until March 31, 1989, when the College terminated her employment. Cagnina Aff. ¶ 3. Initially, Giordano was a provisional employee, but on August 15, 1986 she received a permanent appointment. Cagnina Aff.Exh.B at 1, 2. During her tenure at the College, Giordano filed formal and informal complaints of sexual harassment naming Jackson, Ryerson and Seaman. Cagnina Aff. ¶ 17. In addition, Giordano reported unfair treatment by various other co-workers.

Giordano also experienced a variety of illnesses while a member of the College's staff. In the summer of 1986, Giordano had surgery for an ovarian cyst and a bladder operation. These illnesses caused her to miss much of her job training and required her to take "a lot of sick time," including "[m]any times [when she] had to take half a day off sick leave in the middle of the day." Cagnina Aff. Exh. B at 2. In addition, plaintiff suffered from ulcers, a spastic colon and depression. Complaint ¶ 10.

### B. *Giordano's Allegations of Sexual Harassment*

On September 28, 1987, Giordano filed a formal complaint with the Affirmative Action Office ("AAO") at the College, charging that then chief Jackson had sexually harassed her. She alleged that this behavior began in March 1985 when she applied for the dispatcher job and continued unabated until the date of her complaint. Cagnina Aff.Exh.B at 1. Jackson hired Giordano and served as her supervisor.

According to Giordano, Jackson conditioned her employment as a dispatcher on sexual favors. She claims she submitted initially "because he told [her] that was the only way [she] could get the job," *id.*, and throughout her first year on the job, when the demands continued, because of her provisional status and comments from Jackson such as "[y]ou can always find another job at [another] Security Agency." *Id.* Once she became a permanent employee in August 1986, however, Giordano no longer cooperated with Jackson. As a result, she claims, Jackson would remain in the radio room while she was on duty, talking about sex and making obscene gestures. *Id.* at 2. Finally, Giordano reports, after an argument in June 1987, Jackson no longer would speak to her, but instead "continued to harass [her] with written memos and reprimands concerning [her] job performance." *Id.*

Jackson denied ever approaching or propositioning plaintiff. After plaintiff filed her complaint, Jackson was demoted to Sergeant and no longer supervised plaintiff. Nevertheless, in written memoranda dated December 2, 1987 and February 19, 1988, Giordano again complained to the AAO of continued harassment by Jackson. In addition, on February 24, 1988, Giordano similarly accused Ryerson and Seaman through an informal complaint.

### C. *Defendant's Response to Giordano's Sexual Harassment Allegations*

In response to Giordano's September 28, 1987 complaint against Jackson, Robbie Cagnina ("Cagnina"), the AAO officer at the College, conducted an investigation. She interviewed Giordano and Jackson as well as twenty-one other College employees, twenty of whom worked in the security department. In addition, Cagnina reviewed a tape recording of a January 1987 conversation between Giordano and Jackson which Giordano made. During the investigation, Jackson temporarily was suspended.

Cagnina reported her findings on November 6, 1987. She found evidence of an intimate relationship between the parties, but no evidence of coercion or retaliation in response to Giordano's rejection of Jackson's advances. Further, Cagnina concluded, the reprimands Giordano received were not related to harassment and in fact paralleled penalties given to other employees for similar offenses.

Cagnina criticized the work environment in the security department as "less than professional," but found that Giordano "may have contributed to this atmosphere." As a result of this finding, she recommended that all security department employees attend a sexual harassment

workshop. Ten days after Cagnina reported her findings, Jackson accepted the rank of Sergeant.

Cagnina also investigated Giordano's two informal complaints against Jackson, again finding no evidence of harassment. Finally, in response to Giordano's February 24, 1988 informal complaints regarding the inappropriate behavior of Ryerson and Seaman, Cagnina spoke "to all parties" and concluded from Giordano's failure to pursue a formal complaint that she "appeared to accept that her informal complaint was resolved." Cagnina Aff. ¶ 18.

## DISCUSSION

### A. *The Standard For Granting Summary Judgment*

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the nonmovant. *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment must be granted if no reasonable trier of fact could find for the nonmoving party. *Id.; Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir.1989).

When the nonmoving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the nonmoving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511; *Radich*, 886 F.2d at 1395. Thus, a party opposing summary judgment "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir.1991). Whether a fact is material is determined by substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *United States v. 225 Cartons*, 871 F.2d 409, 410 (3d Cir.1989).

An affidavit in opposition to a properly-supported motion for summary judgment must: (1) show affirmatively that the affiant "is competent to testify to the matters stated therein;" (2) be based on "personal knowledge;" and (3) establish facts that "would be admissible at trial." Fed. R.Civ.P. 56(e); *see Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (3d Cir.1988). In sum, an affidavit offered in opposition to a motion for summary judgment must establish a proper foundation for the facts stated within it. *Williams v. West Chester*, 891 F.2d 458, 471 (3d Cir.1989) (Garth, J., concurring). Affidavits that fail to satisfy these requirements "may not be considered" on a motion for summary judgment. *Hlinka*, 863 F.2d at 282–83.

Additionally, the affidavit "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Therefore, the nonmovant "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110

S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). The Court is not to presume the existence of specific facts from general averments. *Id.* The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Id.* at 888–89, 110 S.Ct. at 3188–89.

### B. *The Sexual Harassment Claims* [1]

■ Under Title VII it is unlawful for an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2. This statute imposes liability on an employer for sexual harassment of its employees under two theories, quid pro quo and hostile environment.

In the first instance, liability exists when an employer threatens to alter an employee's job conditions unless the employee assents to the employer's sexual demands. *See Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989). To state a hostile work environment claim, in contrast, an employee need not show that she faced demands for sex, rather, she must demonstrate "the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." *Andrews v. Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990) (*quoting Vance v. Southern*

*Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989)). The Court reads plaintiff's complaint as stating both quid pro quo and hostile environment claims and will consider each in turn.[2]

### 1. Quid Pro Quo Sexual Harassment

■ The Third Circuit has not directly defined the nature of employer liability in a quid pro quo sexual harassment case. The Supreme Court, however, has noted that traditional agency principles provide sound guidance in this area, *see Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 70, 106 S.Ct. 2399, 2407, 91 L.Ed.2d 49 (1986), and that a lack of notice of the abuse will not necessarily insulate an employer from liability. *Id.* at 72, 106 S.Ct. at 2408.

Following *Vinson*'s lead, circuit courts have imposed strict employer liability in cases of quid pro quo sexual harassment. *See Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185–86 (6th Cir.1992); *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 785 (1st Cir.1990); *Carrero v. New York City Housing Authority,* 890 F.2d 569, 579 (2d Cir.1989); *Steele,* 867 F.2d at 1316. Describing this rule as "logical," the *Steele* court explained that when a supervisor, relying on his actual or apparent authority to hire, fire, discipline and promote, "requires sexual favors as quid pro quo for job benefits, the supervisor, by definition, acts as the company." *Steele,* 867 F.2d at 1316.

In a related context the Third Circuit relied on agency principles to impute discriminatory actions of employees to their employer. *See Levendos v. Stern Entertainment, Inc.,* 909 F.2d 747, 752 (3d Cir. 1990) (constructive discharge claim brought

---

1. Giordano also contends that her termination of employment violated Title VII. Complaint ¶ 10. Because Giordano herself admits that her termination was not an act of discrimination, *see* Kleva Aff. Attachment 2, the Court will not address this claim.

2. In reaching this conclusion, the Court has considered plaintiff's complaint filed with the Court as well as her formal complaint to the AAO at the College. Because plaintiff has not responded to defendant's motion for summary judgment, the Court lacks the benefit of any specific factual or legal arguments on her be-

half. Since the complaint filed with the Court alleged Title VII violations, the Court will evaluate plaintiff's claims under quid pro quo and hostile environment theories.

The Court, however, will not consider the claims plaintiff advanced in her pretrial submissions based on the due process clause of the fourteenth amendment and 42 U.S.C. §§ 1981, 1983. Plaintiff's complaint does not contain these allegations and she has not moved to amend her complaint to add these legal theories.

by female maitre d' forced to resign due to acts of sexual discrimination of general manager and chef). Because it is unlikely that the Third Circuit would refuse to apply these principles in the quid pro quo harassment context, the Court will follow the strict liability rule adopted by other circuits.

■ When applying this rule, courts have used a five-part test to determine whether plaintiff can recover from her employer. *See e.g., Kauffman,* 970 F.2d at 186; *Chamberlin,* 915 F.2d at 783–84. Specifically, the plaintiff employee must show (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment complained of was based on sex; (4) that her submission to the unwelcome advances was an express or implied condition for receiving job benefits or that her refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and finally (5) that respondeat superior liability exists. *Kauffman,* 970 F.2d at 186.

■ Giordano successfully states a claim of quid pro quo sexual harassment since there can be little doubt that she has satisfied the five requisite factors. As a woman she is a member of a protected class. In addition, she alleges she was the object of unwelcome sexual harassment in the form of demands for sex. That the exact nature of the relationship between the parties is disputed does not defeat plaintiff's claim that Jackson's attention was unwelcome. It is clear from the record that Giordano and Jackson had intimate relations. Giordano characterized the contact as coercive, while Jackson denied any involvement with plaintiff, and Cagnina found that the parties had a "mutually agreed upon" personal relationship. Cagnina Aff.Exh.C. These inconsistent views present an issue of material fact which is not appropriate for decision at the summary judgment stage.

Moving to the third factor, the Court concludes that the harassment of which Giordano complains was based on sex since there is no evidence that Jackson treated male employees similarly. *See Chamberlin,* 915 F.2d at 784. Finally, Giordano satisfies the remaining two elements, as her complaint to the AAO reveals, by alleging that Jackson, the man who hired and supervised her, made sex an express condition of her appointment as a dispatcher.[3]

The College argues that because it took no action against Giordano her quid pro quo claim must fail. Defendant's Brief at 9. As the College correctly points out, even plaintiff concedes that her termination was the result of absenteeism, not sex discrimination. Kleva Aff. Attachment 2. However, the alleged circumstances surrounding plaintiff's hiring and first year of employment are sufficient to support a quid pro quo sexual harassment claim. It is enough that an agent of the College conditioned Giordano's initial and continued employment on sexual favors.[4]

Because the record reveals issues of material fact with respect to plaintiff's charge of quid pro quo sexual harassment, the Court will deny defendant's motion for summary judgment with respect to this claim.

2. Plaintiff's Hostile Work Environment Claim

In order to prove a hostile work environment claim, a plaintiff must establish the following five elements:

(1) the employee suffered intentional discrimination because of [his or her] sex;

(2) the discrimination was pervasive and regular;

(3) the discrimination detrimentally affected the plaintiff;

---

**3.** Here, the Court relies on the allegations against Jackson, because the record does not contain the specific complaints against Ryerson and Seaman.

**4.** The College's own sexual harassment policy defines sexual harassment as unwelcome sexual advances and requests for sexual favors when "submission to such conduct is made either explicitly or implicity [sic] a term or condition of an individual's employment or academic status." Cagnina Aff.Exh.A.

(4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and

(5) the existence of respondeat superior liability.

*Andrews,* 895 F.2d at 1482.

The first four factors determine whether a hostile environment exists. The last factor establishes the employer's liability for the hostile environment. Unlike quid pro quo claims, respondeat superior liability for hostile environment claims exists when:

> the defendant knew or should have known of the harassment and failed to take prompt remedial action. Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable.

*Andrews,* 895 F.2d at 1486 (citations omitted). Giordano asserts a hostile work environment claim against defendants. Specifically, she alleges that the behavior of her male co-workers created job pressures which "brought on physical and mental disabilities." Complaint ¶ 10. The College argues that it acted properly in responding to plaintiff's sexual harassment claims, doing all it could to intervene and investigate plaintiff's charges. Defendant's Brief at 6–8. The Court agrees.

■ When determining whether an employer's response to a hostile environment claim was "prompt and adequate," courts consider several factors. First, courts examine whether the employer investigated the alleged acts of harassment and the type of investigation the employer conducted. *See Foster v. Hillside,* 780 F.Supp. 1026, 1039 (D.N.J.1992); see also *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir. 1987) (finding no respondeat superior liability where employer conducted prompt investigation, questioning defendant about allegations and interviewing other employees). In the instant case, defendant timely and thoroughly investigated Giordano's harassment claims.

As in *Foster* and *Swentek,* in response to Giordano's charges against Jackson, the College conducted a formal investigation in order to verify Giordano's claims. While the specific dates of defendant's investigation are not before the Court, Cagnina reported her findings to Giordano on November 6, 1987, less than six weeks after Giordano filed her complaint. This time period is reasonable in light of the extensive investigation Cagnina conducted. She interviewed twenty-one employees in addition to Jackson and Giordano, reviewed a tape recording of a conversation between the parties and prepared a written report.

Giordano's subsequent complaints against Jackson were greeted with equally prompt investigations. Cagnina Aff. ¶ 14–15. Consistent with College policy, in these instances Cagnina conducted informal investigations, because Giordano voiced only informal complaints. In response to Giordano's February 2, 1988 allegations against Ryerson and Seaman, Cagnina interviewed all the parties and concluded that Giordano accepted that her complaint was resolved when she did not pursue a formal complaint. *Id.* ¶ 17–18.

Also important in determining employer liability are its post-investigation remedial steps. *See Steele,* 867 F.2d at 1316 (finding no respondeat superior liability where employer reprimanded employee in person and assured staff harassment would end); *Swentek,* 830 F.2d at 558 (written warning and reprimand following investigation adequate response from employer). In the case at bar, although the College found no evidence to support Giordano's charges against Jackson, it took action to remove Jackson's supervisory role over Giordano. During the investigation Jackson was temporarily suspended. Ten days after Cagnina issued her report, Jackson was demoted to Sergeant. In addition, the College took steps to educate the entire security department, requiring its members to attend sexual harassment workshops.

Another factor that helps determine respondeat superior liability is the "existence of a grievance procedure and a policy against discrimination." *See Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408. The College has had a written sexual harassment policy

in place since March 2, 1987, six months prior to Giordano's initial complaint. Cagnina Aff. ¶ 4. Prior to this time, the AAO conducted sexual harassment workshops for employees. *Id.*

Finally, in judging the effectiveness of remedial measures, courts also examine whether the harassment ended after such steps were taken. *See Foster,* 780 F.Supp. at 1039; *see also Steele,* 867 F.2d at 1316 ("Of special importance, Bucknole's harassment ended after the remedial action; the corporate employer, therefore, is not liable for Bucknole's actions under the doctrine of respondeat superior.")

On two occasions following her initial complaint, Giordano reported that Jackson sexually harassed her. In contrast, after her February 2, 1988 allegations against Ryerson and Seaman, Giordano did not file additional complaints against these men. The allegations against Jackson came to the AAO through memoranda dated December 2, 1987 and February 19, 1988. In each instance, the College conducted an informal investigation and found no evidence of harassment. Cagnina Aff. ¶ 14–15.

Subsequently, by letter dated March 22, 1988, Giordano, through her attorney, complained directly to Acting Chief Ryerson that her rotating shifts periodically resulted in supervision by Jackson and continued harassment. Chief Ryerson, by letter dated April 8, 1988, assured plaintiff's attorney that Giordano was under his own command and at no time had Jackson been assigned to supervise Giordano. He also invited plaintiff to submit a formal request for a shift change, expressing a willingness to accommodate her. Giordano filed no additional complaints against Jackson.

■ Although harassment from Jackson apparently continued for six months after plaintiff's initial complaint against him, the Court is unwilling to rest liability on this factor alone. In the Court's view, the College promptly and adequately responded to Giordano's complaints. As a result, the College cannot be liable for sexual harassment based on a hostile environment claim.

## CONCLUSION

For the reasons discussed above, the Court will grant defendant's motion for summary judgment as to plaintiff's sexual harassment claim based on a hostile environment theory and deny defendant's motion as to the quid pro quo sexual harassment claim.