292 N.J. Super. 36 (1996)
678 A.2d 279
JOANNE PAYTON, PLAINTIFF-APPELLANT,
v.
NEW JERSEY TURNPIKE AUTHORITY, MICHAEL STANKOWITZ AND ROBERT C. GEBERTH, INDIVIDUALLY AND AS EMPLOYEES OF NEW JERSEY TURNPIKE AUTHORITY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 1996.
Decided June 28, 1996.
*38 Before Judges D'ANNUNZIO, CONLEY and BRAITHWAITE.
Patricia Talbert argued the cause for appellant (Stryker, Tams & Dill, attorneys; Ms. Talbert and Charles H. Friedrich, on the brief).
*39 James Anelli argued the cause for respondent (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Mr. Anelli and Michael K. Furey on the brief).
Smith Mullin and Breuninger, Hansen & Fellman, attorneys for amicus curiae New Jersey Employee Lawyers Association (Christopher P. Lenzo and Patricia M. Breuninger, on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
In this action based on alleged sexual harassment, plaintiff appeals, pursuant to leave granted, from an order entered on the motion of defendant New Jersey Turnpike Authority (Authority) "protecting from discovery all investigative reports and notes relating to plaintiff's internal sexual harassment complaint, as well as the minutes of the Commissioner's April 25, 1995 Executive Session Hearing." Plaintiff also appeals, pursuant to leave granted, the denial of her cross-motion to suppress the Authority's affirmative defense that it "has taken effective remedial measures under its internal anti-harassment policy such that it is not liable for compensatory or punitive damages under Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993)." We now reverse the protective order and remand for further proceedings.
Plaintiff, Joanne Payton, was employed by the Authority as a maintenance records clerk. She began her employment with the Authority in 1990. In September 1994, plaintiff filed a complaint with the Authority's Equal Employment Opportunity Department alleging that two Authority employees, Robert Geberth and Michael Stankowitz, violated the Authority's sexual harassment policy.
Plaintiff contends that as of March 10, 1995, the Authority had taken no action against Geberth and Stankowitz. On that date, plaintiff commenced this action in the Superior Court. In the complaint, plaintiff alleges that Geberth is the "highest ranking administrator of the unit in which the plaintiff works," and that *40 Stankowitz is the "second-in-command" of that unit. The complaint alleges that Geberth and Stankowitz sexually harassed plaintiff "and others in her work place, retaliating against the Plaintiff when she objected to the harassment." Plaintiff also alleges that "the wrongful conduct included sexually offensive touching and other acts of such pervasiveness and severity which created a hostile work environment." The complaint includes the following specific allegations:
(a) Defendant Geberth commented about Plaintiff's clothing grabbing the bottom of her skirt and pulling it down, stated her clothes look like she is "wearing pajamas," put his hand around the Plaintiff, on her shoulder or on her knee and called Plaintiff into his office directing that she turn around so that he could look at her;
(b) Defendant Stankowitz told Plaintiff on several occasions that he was "horny" and wanted "to get laid," referred to Plaintiff's breasts and said to her "just one time," tried to look down Plaintiff's blouse and, during lunch at a restaurant, took the Plaintiff's hand and put it between his legs;
(c) During the office holiday luncheon on or about December 1993, Defendants Geberth and Stankowitz gave Plaintiff a "baby doll" nightgown. Defendant Geberth insisted that she open the gift in front of her office co-workers who were attending the luncheon; and
(d) On or about July, 1993, Defendant Geberth slapped a female co-worker on the buttocks in the presence of several co-workers, including the Plaintiff.
The complaint also states that plaintiff filed an internal complaint with the Authority in September 1994 but that "Defendants have refused to act and to eliminate the hostile work environment created by Plaintiff's superiors," and that subsequent to the filing of the internal complaint, "Defendants ostracized her and refused to communicate with her."
Plaintiff alleges that these events violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq., and she seeks compensatory and punitive damages and other relief.
On April 26, 1995, the Star-Ledger, a New Jersey newspaper of statewide circulation, reported that the Authority's commissioners had, on the previous day, sanctioned Geberth and Stankowitz for their sexual harassment of plaintiff. The Star-Ledger reported that the sanctions included demotion, reduction in pay, and suspension without pay: four months for Geberth and two months for *41 Stankowitz. The article named Geberth and Stankowitz, but it did not identify plaintiff.
Subsequent to the commencement of this litigation, plaintiff filed a demand for documents. The demand, addressed to the Authority, included "all documents relating to any investigation that was conducted by or for the defendant having to do with the plaintiff and her employment with defendant" and "all documents relating to any investigation that was conducted by or for the defendant having to do with the plaintiff and her administrative complaint alleging sexual harassment." Plaintiff also served the Authority with a supplemental demand seeking copies of "any minutes, transcriptions, reports, supporting documents, agendas, recordings related to [the Commissioners' April 25] meeting."
On May 25, 1995, the Authority moved for a protective order under R. 4:10-3, claiming the following privileges: 1) a public policy privilege under the LAD and Executive Order No. 88; 2) the self-critical analysis privilege; 3) the attorney-client privilege; and 4) the express exceptions to governmental disclosures as set forth in the Open Public Meetings Act. The Authority also sought an order sealing the record.
On August 7, 1995, plaintiff cross-moved to strike the Authority's affirmative defense that it took effective remedial measures in response to the internal complaint.
On October 13, 1995, the parties appeared before the court for oral argument on the Authority's motion. The court granted the protective order sought by the Authority, without an in camera review of any of the material plaintiff sought. It held:
The Court would have to put on blinders to fail to recognize the fact that those who come forward in terms of this type of investigation do so with an understanding that any communication would be privileged. And as such, the Court must take that into account. I am satisfied that in order for the law against discrimination to be provided with meaning, that it must provide and protect confidentiality to those who are encouraged under the law to step forward and to provide without fear of disclosure, information pertinent to their knowledge with regard to incidents of sexual  alleged incidents of sexual harassment.
Anything the Court would do at this point to undermine that process would not only run contrary to the interest of this plaintiff, but contrary to the interests of all *42 parties equally situated. The EEO statement and Executive Order 88 have acknowledged the fact that a great percentage of sexual harassment, in particular in the workplace, is  unreported. And certainly if this Court were to deny the protective order and to permit within the context  even within the context of this litigation, disclosure of information that was provided under the cover of confidentiality, it would be in effect permitting individual  individual interests to undermine the purpose, the very purpose of the act which benefitted the interest of the plaintiff in this case in terms of the public interest.
The court further noted that to allow discovery of the requested materials would be inappropriate and contrary to the intent of the LAD. The court found that while normally full disclosure was encouraged, certain exceptions to this policy exist. The court ruled that the public policy concerns of confidentiality were paramount and overrode the individual need to know. Additionally, the court found that the information sought by plaintiff was obtainable by traditional means of discovery. Finally, the court held that with regard to the suppression of the Authority's defense, the court was not dismissing with prejudice plaintiff's right to re-assert this position and left open the possibility of future exceptions from the protective order.
The court entered the order precluding discovery and sealing all records in this matter. The court entered a separate order denying plaintiff's motion to suppress the Authority's affirmative defense "as it related to the investigation it conducted and to any other defenses arising out of its investigation."
During the proceedings below, the Authority produced a privilege document log and a memorandum dated April 20, 1995 to the Chairman and Commissioners of the New Jersey Turnpike Authority from the Authority's Executive Director. Because they sharpen the focus of this dispute, and in the case of the log provides the only information defining the disputed material, we reproduce the log and part of the memorandum. The log states:
In accordance with the brief filed on May 25, 1995, by the New Jersey Turnpike Authority in support of its Motion for a Protective Order, the Authority contends that the following documents are privileged and confidential based upon: (1) the public policy underlying the Law Against Discrimination (LAD); (2) the self-critical analysis privilege; (3) attorney-client privilege; (4) the confidentiality exceptions of the Open Public Meetings Act.

*43 1. Investigation memo, dated December 8, 1994, advising of investigation and initial findings by the Director of the Department of Equal Opportunity ("EEO Officer").
2. Final Investigative Reports, dated March 14, 1995, and interview notes of the EEO Officer and Mark Margiotta, Esq., former employee in the Authority's Law Department  (one report deals with the allegations against Robert Geberth and the other deals with the allegations against Michael Stankowitz.)
3. Confidential report of the Authority's Sexual Harassment Advisory Committee, dated April 13, 1995, which includes the Committee's review of the final Investigative Reports, their evaluative findings, and their recommendations for remedial measures.
4. Memo, dated April 18, 1995, from Director of Law to Commissioners transmitting the Investigative Reports and advising that the matter is scheduled for Executive Session discussion and will be on the agenda for consideration of disciplinary action.
5. Minutes/Notes of the Executive Session of the Commissioners of the New Jersey Turnpike Authority held on April 25, 1995.
The first four paragraphs of the memorandum outline the Authority's alleged response to plaintiff's internal complaint:
On or about September 7, 1994, a New Jersey Turnpike Authority employee who shall be referred to as "Jane Doe" filed with the New Jersey Turnpike Authority's Equal Employment Opportunity Office ("EEO") a sexual harassment complaint against Robert Geberth and Michael Stankowitz, charging each of them with violations of the Turnpike Authority's sexual harassment policy.
The EEO Office immediately commenced an investigation of the charges. In January 1995 at the recommendation of the acting Director of Law and general Counsel, Mark Margiotta, a law clerk in the office of the Acting Director of Law, was assigned to assist the EEO Office in the completion of the investigation.
On March 14, 1995 the EEO Office submitted its findings of fact and recommended conclusions to a Review Committee consisting of Directors Garrity, Schladebeck, Hatala and Dale.
The Review Committee rendered its report to the Executive Director on April 13, 1995. It adopted the findings of fact of the EEO Office, finding that Robert Geberth and Michael Stankowitz violated the Authority's policy against sexual harassment by directing inappropriate sexual remarks and other unwelcomed conduct towards Jane Doe, and recommended the following discipline.
Our focus in this discovery dispute is the Authority's potential liability for compensatory and punitive damages due to its supervisors' alleged sexual harassment of plaintiff. In its brief, the Authority contends that
the employer's liability for the harassment does not depend upon the specifies of the investigation undertaken. Rather, it will depend upon whether the employer *44 has responded to the harassment in a reasonable manner. This does not, and should not, involve a review of the investigation itself, but a focus on the discipline and other remedial actions taken by the employer.
We disagree. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993) is the bellwether New Jersey decision regarding this issue. In Lehmann, the Court held that "employer liability for supervisory hostile work environment sexual harassment shall be governed by agency principles." Id. at 619, 626 A.2d 445. The Court relied on Restatement (Second) of Agency § 219, as the foundation of its subsequent analysis. Section 219 provides:
(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
(a) the master intended the conduct or the consequences, or
(b) the master was negligent or reckless, or
(c) the conduct violated a nondelegable duty of the master, or
(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
The Court ruled that pursuant to Restatement § 219(1), an employer is liable for a supervisor's conduct in creating a hostile work environment when the supervisor is acting within the scope of his or her employment. Id. at 619, 626 A.2d 445.
When, however, a supervisor is not acting within the scope of his or her employment, characterized by the Court as the "more common situation," the employer will be liable under Restatement § 219(2)(a) through (d). Id. at 619-20, 626 A.2d 445. Thus, under § 219(2)(b), which posits vicarious liability for an employer's negligence, the Lehmann Court explained:
In light of the known prevalence of sexual harassment, a plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms. We do not hold that the absence of such mechanisms automatically constitutes negligence, nor that the presence of such mechanisms demonstrates the absence of negligence. However, the existence of effective preventive mechanisms provides some evidence of due care on the part of the employer.

*45 Employers that effectively and sincerely put five elements into place are successful at surfacing sexual harassment complaints early, before they escalate. The five elements are: policies, complaint structures, and that includes both formal and informal structures; training, which has to be mandatory for supervisors and managers and needs to be offered for all members of the organization; some effective sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted; and then, finally an unequivocal commitment from the top that is not just in words but backed up by consistent practice. [The Civil Rights Act of 1991: Hearings on H.R.1 Before the House Committee on Education and Labor, 102nd Cong., 1st Sess. 168, 171 (1991) (Statement of Dr. Freada Klein).]
Similarly, given the foreseeability that sexual harassment may occur, the absence of effective preventative mechanisms will present strong evidence of an employer's negligence.
[Id. at 621-22, 626 A.2d 445 (emphasis added).]
The Court suggested that vicarious employer liability will be established under § 219(2)(a) if the employer intended the harassing conduct, and further suggested that "[i]f a plaintiff can show that an employer had actual knowledge of the harassment and did not properly and effectively act to stop it, liability under that section may be appropriate." Id. at 623, 626 A.2d 445 (emphasis added).
Regarding vicarious liability under § 219(3)(d), the Court observed:
The EEOC's Policy Guidance on Current Issues of Sexual Harassment, 8 Lab.Rel.Rep. (BNA) ¶ 405.6682 (1990), would apply the Restatement § 219(2)(d) to those situations in which there was an inadequate harassment policy, or a policy was improperly enforced.

If the employer has not provided an effective avenue to complain, then the supervisor has unchecked, final control over the victim and it is reasonable to impute his abuse of this power to the employer. The Commission generally will find an employer liable for "hostile environment" sexual harassment by a supervisor when the employer failed to establish an explicit policy against sexual harassment and did not have a reasonably available avenue by which victims of sexual harassment could complain to someone with authority to investigate and remedy the problem.
Both of those situations could give rise to a reasonable inference that the supervisor's harassing conduct was tacitly approved by upper management, thus triggering liability under § 219(2)(d).
Although an employer's liability for sexual harassment of which the employer knew or should have known can be seen to flow from agency law, it also can be understood as direct liability. When an employer knows or should know of the *46 harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser. See Anderson, supra, 87 Colum.L.Rev. at 1274-75. "Effective" remedial measures are those reasonably calculated to end the harassment. The "reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment." Ellison, supra, 924 F.2d at 882.
[Id. at 623, 626 A.2d 445 (emphasis added).]
Finally, the Court ruled that an employer should be liable for punitive damages "only in the event of actual participation by upper management or willful indifference." Id. at 625, 626 A.2d 445.
Lehmann established that the core inquiry in a cause of action against an employer in a case such as this is whether the employer had an effective, properly enforced anti-harassment policy. We conclude, therefore, that an employer's response to an employee's complaint is central to a plaintiff's cause of action. Accord Bouton v. BMW of North America, Inc., 29 F.3d 103, 106 (3rd Cir.1994); Giordano v. William Paterson College, 804 F. Supp. 637, 643 (D.N.J. 1992).
Thus, in the present case, plaintiff needs the information necessary to measure the Authority's response to her complaint. That information would include, at the very least, the extent of the Authority's investigation, the timing of the Authority's investigation relative to the date of plaintiff's complaint to the department, the information gleaned by the Authority from its investigation, the Authority's evaluation of the information, and the action taken by the Authority. See Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir.1994) (reversing summary judgment for employer and noting that the employer "was consistently slow to react" to female employee's claims); see also Giordano, supra, 804 F. Supp. at 643. Access to this material is not for the purpose of proving that Geberth and Stankowitz engaged in sexual harassment, although it may be of assistance in that regard, but rather, to establish the Authority's vicarious liability under agency principles as defined in Lehmann.
*47 We reject the Authority's argument that the only relevant fact is the remedial action it took on April 25, 1995. The argument ignores the fact that timeliness of an employer's response is an important element in determining the effectiveness of an anti-harassment program. Giordano, supra, 804 F. Supp. at 643. A slow response may be perceived as a reluctant response and call into question the bona fides of an employer's anti-harassment program. Similarly, an investigation, though timely instituted, may be pursued half-heartedly and unduly prolonged. On the other hand, a timely, vigorously pursued inquiry that corroborates the victim's accusations will compromise a well-designed anti-harassment program, if the employer drags its feet in acting on the corroborative evidence. Although it is not central to our decision in this case, we note, as an example, the likelihood that plaintiff will rely on the fact that the Authority's investigators did not recommend remedial action until plaintiff filed her complaint in the Superior Court. See Steiner, supra, 25 F.3d at 1464 (observing that the employer did not reprimand the offending supervisor until after the employee had filed her complaint).
The evidence may establish that the Authority's response was timely, vigorous and appropriate. However, plaintiff will be unable to make that determination until she has access to the disputed documents. Under Lehmann's analysis of employer liability, access to the material is crucial to plaintiff's case against the Authority.
The Authority argues that the protective order must be affirmed to preserve the confidentiality of sexual harassment investigations. The Authority points to former Governor Florio's Executive Order No. 88 and the report of the Review Committee on Sexual Harassment New Jersey Department of Personnel (hereafter Committee Report), as well as In re Seaman, 133 N.J. 67, 627 A.2d 106 (1993), as support for its contention. Executive Order No. 88 did not mention confidentiality. The Executive Order created the Review Committee, and the Committee Report emphasized the need to treat a sexual harassment complaint with *48 confidentiality and sensitivity. The Committee Report noted that victims of sexual harassment tend to put up with the harassment and do not report it or otherwise complain because of fear of retaliation, loss of privacy, and concern regarding confidentiality. In In re Seaman, supra, a disciplinary proceeding regarding a judge found to have committed acts of sexual harassment, the Court ordered that in such judicial-disciplinary cases the "anonymity of the alleged victim" should be preserved "to protect the victim's privacy and encourage reporting of such offenses." Id. at 75, 627 A.2d 106.
We fail to see the applicability of those concerns in the present case where it is the alleged victim who seeks the material after having gone public with her allegations by filing an action in the Superior Court. To the extent that the Authority's argument encompasses a concern for the privacy of the alleged harassers, their privacy has been compromised by the Star-Ledger story as well as by plaintiff's Superior Court action.
We agree, however, that witnesses who gave statements or otherwise provided information to the Authority's investigators may have a legitimate expectation of confidentiality regarding their identities. The record suggests that the investigators informed witnesses that their statements would be confidential to the extent possible. Thus, when the trial court on remand reviews the disputed material, the court shall determine whether the identities of the witnesses shall be protected by appropriate redaction. We emphasize, however, that it may not be possible to protect those identities throughout the entire course of the litigation consistent with plaintiff's right to the opportunity to establish a cause of action against the Authority.
We reject the Authority's contention that the material is protected by the privilege of self-critical analysis. See Wylie v. Mills, 195 N.J. Super. 332, 337-40, 478 A.2d 1273 (Law Div. 1984). As previously indicated, the Authority's response to plaintiff's complaint is central to plaintiff's cause of action against the Authority. Moreover, the employer had a legal duty under both *49 the LAD and Lehmann to respond in an effective manner. Consequently, disclosure of the material will not have a chilling effect on the employer's willingness to engage in "voluntary" self-analysis or evaluation.
The Authority contends that production of the material will violate the attorney-client privilege. We cannot fully address this contention because of the inadequate record. As previously indicated, the trial court did not examine the documents and the record contains only a brief description of them. See McClain v. College Hosp., 99 N.J. 346, 353, 492 A.2d 991 (1985) (stating that in light of the limited record regarding the documents sought in discovery the Court elected "to review the objection generally, set forth the appropriate standards, and remand the matter to the trial court for further proceedings").
The privilege is codified in N.J.S.A. 2A:84A-20, and is part of our evidence rules. N.J.R.E. 504. We had occasion to discuss the privilege in United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 483 A.2d 821 (App.Div. 1984) (hereafter Wolosoff) and in Macey v. Rollins Envtl. Servs. (N.J.), Inc., 179 N.J. Super. 535, 432 A.2d 960 (App.Div. 1981) (hereafter Macey). The Authority cites Macey to support its position that the privilege protects the documents plaintiff seeks.
Macey was an appeal by defendant Rollins from a trial court order compelling it to produce a written statement prepared by Rollins' project engineer at the request of Rollins' general counsel. The statement concerned a fire and explosion at one of Rollins' plants, in which six persons were killed and many others were injured. We noted that the privilege is designed "to promote full and free discussion between a client, an attorney, and the attorney's agents in order to prepare one's case. To further this policy it is essential that a client be able to protect his discussions with his attorney from disclosure to his adversary." Macey, supra, 179 N.J. Super. at 539, 432 A.2d 960.
In reversing the trial court, we held that the privilege "extends to corporations which must act through agents, including its *50 officers and employees." Id. at 540, 432 A.2d 960. We ruled that "[t]he necessity for full and open disclosure between corporate employees and in-house counsel ... demands that all confidential communications be exempt from discovery." Ibid. Accord Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).
There is a significant difference between Macey and the present case. Macey involved potential personal injury and death actions against the corporation as a result of the explosion. Consequently, the communication between the client's agent, i.e., the project engineer, and counsel, fitted neatly into the attorney-client relationship, including the need for full and open disclosure which the privilege is designed to foster and protect. In the present case, however, the genesis of the investigation was the Authority's legal duty to address harassment complaints in a responsive and effective manner, consistent with its anti-harassment policy. Thus, as previously indicated, the Authority's response is the issue, and the Authority recognized that fact in its answer when it defended on the ground that it took effective remedial measures. We deem it unlikely that the Supreme Court in Lehmann, having defined a cause of action against an employer based in part on the employer's response to a harassment complaint, intended to permit an employer to immunize its response from inquiry by assigning a lawyer to investigate the complaint.
Wolosoff involved an action by the bank to rescind a settlement with a debtor. The bank contended that it had agreed to accept approximately twenty per cent of the amount owed in full satisfaction of the obligation in reliance on the debtor's fraudulent representations regarding his assets. The debtor had negotiated the settlement with Mulligan, the bank's vice president and in-house counsel. The bank appealed from an order requiring it to disclose "all confidential communication." Id. at 560, 483 A.2d 821. The trial court had entered the order on the ground that the communications might be relevant to the issue of the bank's reliance on the allegedly fraudulent misrepresentations.
*51 We ruled that we were unable to determine on the limited record whether communications between Mulligan and others were protected by the privilege. We remanded for an in camera review of the documents to determine their nature and content. We observed, however, that Mulligan's status as an attorney, standing alone, was insufficient to clothe his communications with the privilege, and that the privilege extends only to communications made to an attorney in his professional capacity. Id. at 562, 483 A.2d 821. "Stated somewhat differently, the privilege accords the shield of secrecy only with respect to confidential communications made within the context of the strict relation of attorney and client." Ibid.
Metalsalts Corp. v. Weiss, 76 N.J. Super. 291, 184 A.2d 435 (Ch.Div. 1962), involved an application of these principles. There, the corporate plaintiff had employed counsel to investigate certain activities of defendant Weiss, a corporate executive. The court held that communications by corporate officers and employees to the lawyer in response to the lawyer's investigative efforts were not protected by the privilege. The court explained its rationale:
Here, Mr. Doherty undertook to serve as an investigator and not as a lawyer. The service rendered could have been rendered by any corporate agent who was not a lawyer. It was not such an undertaking as required the legal services of a lawyer. Mr. Doherty was not undertaking the investigation as part of any litigation then pending between the parties, nor was he being called upon to render legal advice. In my opinion Mr. Doherty was not acting "peculiarly within the province of an attorney at law," and therefore the attorney-client privilege cannot be asserted as a bar to discovery proceedings. As was stated in In re Selser, supra, [15 N.J. 393, 105 A.2d 395] the privilege is to be strictly construed.
If all activities of a lawyer are to be classified as warranting the bar of discovery proceedings because of the attorney-client privilege, then it would be appropriate for clients to retain lawyers as investigators, custodians of records and the like, thereby turning the shield of the privilege into the sword of injustice.
[Id. at 299, 184 A.2d 435.]
See also Hansen v. Janitschek, 31 N.J. 545, 158 A.2d 329 (1960), rev'g on dissent 57 N.J. Super. 418, 433, 154 A.2d 855 (App.Div. 1959); Palatini v. Sarian, 15 N.J. Super. 34, 41-43, 83 A.2d 24 (App.Div. 1951). But cf. Harding v. Dana Transport, Inc., 914 *52 F. Supp. 1084, 1091 (D.N.J. 1996) (rejecting the distinction between an attorney acting as an investigator rather than as a lawyer).
We also addressed the issue of waiver in Wolosoff. Reliance was a critical element of the bank's cause of action for fraud. Because the bank was asserting that it relied to its detriment on defendant's representations, documents pertinent to the issue of reasonable reliance had to be disclosed. Wolosoff, supra, 196 N.J. Super. at 567, 483 A.2d 821. See Glenmede Trust Co. v. Thompson, 56 F.3d 476, 486-87 (3rd Cir.1995) (holding that client who asserts reliance on the advice of counsel as an affirmative defense waives the attorney-client privilege as to all communications as to the entire transaction); Harding, supra, 914 F. Supp. at 1093 (holding that employer waived the attorney-client privilege when it relied on its investigation and response to sexual harassment complaint as a defense).
Moreover, the privilege is not sacrosanct. See In re Kozlov, 79 N.J. 232, 242, 398 A.2d 882 (1979). The privilege may be pierced upon a showing of need, relevance and materiality, and the fact that the information could not be secured from any less intrusive source. Id. at 243-44, 398 A.2d 882. In the present case, the information at issue is that which the Authority possesses as a result of its investigation. The information plaintiff may develop by deposing the same informants would not necessarily replicate what those informants told the Authority.
We anticipate that the documents at issue may contain different levels of involvement by the Authority's lawyers. Lawyers may have participated in gathering the information, analyzing and evaluating the information, and giving advice and making recommendations to the Authority's executives. The advice and recommendation function may be divided between an evaluation of the validity of plaintiff's complaint against Geberth and Stankowitz, and advice to the Authority regarding its role and exposure to liability. On remand, the trial court must review the documents in camera in light of Lehmann, the principles applicable to the attorney-client privilege, and the need to shield the identities of *53 witnesses who provided information to the Authority. After reviewing the documents, the court must make specific determinations regarding plaintiff's access to them, including an expression of reasons for the court's rulings.
The Authority also contends that the Open Public Meetings Act, specifically N.J.S.A. 10:4-12b(3), (7) and (8), preclude dissemination of the minutes of the executive session of the Authority's Commissioners held on April 25, 1995. We cannot address the issue because the trial court did not address it and because we do not know what those minutes contain. We note, however, that the Act permits a public body to exclude the public from certain portions of a public meeting under certain circumstances. Ibid. On remand, the trial court shall review the minutes in camera and determine whether the Act precludes discovery of the minutes or any part of them, in light of applicable law, and in light of any previous public disclosure by the Authority. See Atlantic City Convention Ctr. Auth. v. South Jersey Publishing Co., 135 N.J. 53, 68-69, 637 A.2d 1261 (1994); South Jersey Publishing Co. v. New Jersey Expressway Auth., 124 N.J. 478, 591 A.2d 921 (1991).
To recapitulate, plaintiff is entitled to access to those documents which define the nature and quality of the Authority's response to the internal complaint. In providing the material, however, the trial court should protect, to the extent possible, the identities of informants and others who may have been the victims of sexual harassment. Private information not germane to the issue of sexual harassment may also be excluded so long as the exclusions do not impair plaintiff's opportunity to prove her case.
Moreover, in reviewing the material, the court must make determinations regarding the attorney-client privilege and the Open Public Meetings Act, as we have previously indicated. The in camera review shall include a methodology to identify documents to facilitate any appellate review.
The trial court must also reconsider the need to seal the record. R. 1:2-1 prohibits the sealing of a record "except for good *54 cause shown." The burden of establishing good cause is on the Authority. See Zukerman v. Piper Pools, Inc., 256 N.J. Super. 622, 627, 607 A.2d 1027 (App.Div. 1992), certif. denied, 130 N.J. 394, 614 A.2d 617 (1992). The expectation of public access "may be overcome when an important state interest is at stake." Div. of Youth & Family Serv. v. J.B., 120 N.J. 112, 127, 576 A.2d 261 (1990). Although we are unable to discern on this record a state interest sufficient to justify sealing the record, we leave the initial decision to the trial court, to be made only after the in camera review of documents.
The order protecting the documents from discovery and sealing the record is reversed and the case is remanded for further proceedings. The order denying plaintiff's motion to strike the Authority's affirmative defense is affirmed in light of our remand of the discovery issue.