703 A.2d 941

CATHERINE CONNOLLY, PLAINTIFF–APPELLANT, v. BURGER KING CORPORATION, DEFENDANT–RESPONDENT, AND DIME–MOR I, INC., DIME–MOR II, INC., DIME–MOR–III, INC., JAMES DUYM, AND RON SOLON, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted October 22, 1997—Decided November 14, 1997.

---

Before Judges SHEBELL, D'ANNUNZIO and COBURN.

*Alan H. Schorr*, attorney for appellant (*Mr. Schorr*, on the brief).

*Jackson, Lewis, Schnitzler & Krupman*, attorneys for respondent (*Timothy D. Speedy*, of counsel; *Mr. Speedy, Diane Windholz* and *Terri L. Freeman*, on the brief).

PER CURIAM.

Pursuant to leave granted, plaintiff in this sexual harassment discrimination case appeals from a trial court order partially denying her motion for discovery. We now reverse and remand.

Plaintiff was employed as manager of a Burger King restaurant. Defendant Burger King Corporation (Burger King) is the franchisor, and defendant Dime–Mor, Inc. (Dime–Mor) is the franchisee. Defendant Ron Solon was employed by Burger King as a quality assurance inspector.

Plaintiff alleges that Solon began inspecting Dime–Mor's restaurants in 1993 and that in the course of those inspections, "Solon repeatedly and blatantly subjected plaintiff to sexual harassment which created a hostile working environment."

Paragraph ten of the first count of the complaint describes some of the alleged incidents:

10. Specifying some, but not all of Solon's acts of sexual harassment to the Plaintiff:

a. On occasions too numerous to list here, Solon made obscene and disgusting comments to the Plaintiff such as, "I like to watch your nipples get hard" (when inspecting the freezer), "If you want me to come inside you all you have to do is say so", and "You don't have to do anything, just lay there and I'll do all the work" (while simulating oral sex with his tongue).

b. On occasions too numerous to list here in detail, Solon grabbed the Plaintiff's breasts and buttocks.

1. Solon repeatedly tried to put his hand up the Plaintiff's skirt.

c. On several occasions Solon grabbed the Plaintiff's hand and tried to place her hand on his genitals. He would accompany these actions with comments such as "Just feel it, you know you want to."

d. On one occasion, Solon pulled his erect penis out of his pants in front of the Plaintiff and said [to] the Plaintiff, "This is what you do to me."

Plaintiff also alleges that she complained to Dime–Mor's management in the person of defendant, James Duym, but that Duym dissuaded her from complaining to Burger King. She alleges that Burger King had received complaints from other stores and other Burger King personnel regarding Solon's sexually harassing activities, but that "Burger King did nothing and allowed Solon's outrageous actions to continue despite receiving repeated com-

plaints." We perceive this first count of the complaint to include an allegation that Burger King tolerated the creation of a sexually hostile working environment.

The second count alleges *quid pro quo* sexual harassment. In it plaintiff states that Solon suggested that the quality assurance test scores he granted would drop if plaintiff did not tolerate his sexually explicit behavior. Plaintiff also alleges in that count that "Defendant Duym was well aware that due to the fact that Solon was sexually harassing the plaintiff, Solon was giving high scores to Duym's stores." She alleges that Duym exploited Solon's interest in plaintiff to his own advantage.

In the third count, defendant alleges that she finally complained to Burger King in October 1995 and that Burger King terminated Solon's employment. She also contends that her employment was terminated on December 2, 1995 because of her complaint to Burger King.

Plaintiff moved for an order compelling Burger King to produce certain documents. The motion included a request for the following material:

> Any and all documents which mention, evidence or refer to complaints made by anyone about inappropriate conduct of a sexual nature of Burger King Corp.'s employees in the State of New Jersey, Pennsylvania or Delaware from 1992 until present.

The trial court denied this application, but it granted plaintiff's application with regard to complaints made regarding Ron Solon.

Plaintiff relies on *Payton v. New Jersey Turnpike Auth.*, 148 *N.J.* 524, 691 *A.*2d 321 (1997), *aff'g* 292 *N.J.Super.* 36, 678 *A.*2d 279 (App.Div.1996), in which the Supreme Court held that materials in the defendant-employer's possession relating to its internal investigation of Ms. Payton's sexual harassment complaint were discoverable. In the present case, however, plaintiff's request is broader. Plaintiff seeks documents relating to sexual harassment complaints made by other Burger King employees and about personnel other than defendant Solon. The request is limited geographically to three states and chronologically to the period from

1992 to "the present." Nevertheless, the principles applied in *Payton,* which were established in *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 626 *A.*2d 445 (1993), are applicable. The Court in *Payton* stated:

> We held in *Lehmann* that the LAD's prohibition of sex discrimination created causes of action for sexual harassment and hostile work environment resulting from that harassment. *Id.* at 600–15, 626 *A.*2d 445. We then reached the difficult issue of employer liability under those circumstances and concluded that employers could be vicariously liable in damages under an agency theory for sexual harassment committed by employees, *id.* at 619–20, 626 *A.*2d 445, and that such liability would be governed by a variable standard depending on the state of mind of the employer. *Id.* at 619–20, 626 *A.*2d 445. Employers that were negligent in failing to take effective steps to end sexual harassment would be liable for compensatory damages, *id.* at 621–23, 626 *A.*2d 445, while those that actually participated in or were willfully indifferent to the wrongful conduct would be liable for punitive damages. *Id.* at 624–25, 626 *A.*2d 445.
>
> Of particular importance in *Lehmann,* we noted that an employer's liability for its own negligence in failing to take effective remedial measures was a form of direct liability in addition to vicarious liability. *Id.* at 623, 626 *A.*2d 445. We stated that
>
>> [w]hen an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser.... "Effective" remedial measures are those reasonably calculated to end the harassment. The reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment.
>
>> [*Ibid.* (quotations and citations omitted).]
>
> Thus, we determined that an employer that failed to take effective remedial measures against a harassing employee was, in essence, liable for its own conduct.
>
> [*Payton, supra,* 148 *N.J.* at 536, 691 *A.*2d 321.]

*R.* 4:10–2(a) authorizes discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence...."

█ The information sought in the present case is relevant in several respects. It is relevant to establish whether Burger King enforced its anti-harassment policies and whether it had "effective

formal and informal complaint structures, training, and/or monitoring mechanisms." *Lehmann, supra,* 132 *N.J.* at 621, 626 *A.*2d 445. Those elements are relevant because "the existence of *effective* preventive mechanisms provides some evidence of due care on the part of the employer." *Ibid.* (emphasis added). "Similarly, ... the absence of *effective* preventative mechanisms will present strong evidence of an employer's negligence." *Id.* at 622, 626 *A.*2d 445 (emphasis added).

Moreover, the absence of effective responses to sexual harassment claims in general may foster an atmosphere of tolerance thereby contributing to a sexually hostile atmosphere and may constitute the willful indifference which is a predicate for the award of punitive damages.

The discovery sought may also illuminate plaintiff's contention that quality assurance inspectors traded, or offered to trade, favorable inspection scores for sexual attention.

Finally, we note that the discovery may provide evidence that the employment of other complainants had been terminated, which may lead to probative evidence regarding plaintiff's contention that she was the victim of a retaliatory discharge.

■ "While we normally defer to a trial court's disposition of discovery matters ... unless the court has abused its discretion, ( ... ), deference is inappropriate if the court's determination is based on a mistaken understanding of the applicable law." *Payton, supra,* 148 *N.J.* at 559, 691 *A.*2d 321 (citation omitted). In the present case, the trial court denied discovery of the material because plaintiff had not established that she had been aware of any other complaints. This is an incorrect standard. As previously indicated, material pertaining to the treatment of other female employees has a potential relevance for reasons beyond a plaintiff's personal perception that she is working in a sexually hostile environment.

Our determination that the material sought is discoverable must be implemented by the trial court with some sensitivity to issues

of privacy, confidentiality and privilege. *See Payton, supra,* 292 *N.J.Super.* at 53, 678 *A.*2d 279; *Payton, supra,* 148 *N.J.* at 542, 559, 691 *A.*2d 321. In this regard, however, " 'it may not be possible to protect [witnesses'] identities throughout the entire course of the litigation consistent with plaintiff's right to the opportunity to establish a cause of action." *Payton, supra,* 148 *N.J.* at 543, 691 *A.*2d 321 (quoting 292 *N.J.Super.* at 48, 678 *A.*2d 279). Regarding confidentiality, the Supreme Court concluded that "the balance weighs in favor of disclosure with appropriate procedures to ensure justified confidentiality in light of plaintiff's paramount interest in obtaining relevant materials." *Id.* at 544, 691 *A.*2d 321.

Additionally, the trial court must determine the appropriate time period from which the material must be produced. The date of the filing of the complaint, or termination of plaintiff's employment, may be appropriate cut-off dates.

Finally, the record does not reveal the volume of material which would satisfy the discovery request. There may have been no other complaints, or there may have been hundreds of them. If the volume is substantial, then the court, in the exercise of its sound discretion, may be required to place limits on the chronological or geographic scope of the request, or utilize other techniques to manage the flow of material.

The denial of paragraph two in the trial court's May 16, 1997 order is reversed. The matter is remanded for further proceedings consistent with this opinion.