Ethel L. WAUGH, et al., Plaintiffs,

v.

PATHMARK STORES, INC.,
et al., Defendants.

Civil No. 99–1423.

United States District Court,
D. New Jersey,
Camden Vicinage.

April 4, 2000.

Richard E. Yaskin, Law Offices of Richard E. Yaskin, Voorhees, NJ, for Plaintiffs.

Peter L. Frattarelli, Archer & Greiner, P.C. Haddonfield, NJ, for Defendant Pathmark.

## OPINION

ROSEN, United States Magistrate Judge.

### I. INTRODUCTION

Presently before the court is the motion of the plaintiffs, Ethel and Robert Waugh, to compel the deposition of John Thomas Wynn, Esquire, Defendant Pathmark's in-house counsel, and to compel the production of documents created by Mr. Wynn allegedly related to the remediation efforts of Defendant Pathmark relative to Plaintiff Ethel Waugh. After having reviewed the submissions of the parties as well as the argument conducted on the record on March 23, 2000, the plaintiffs' motion shall be *denied.*

### II. FACTUAL AND PROCEDURAL BACKGROUND

On March 26, 1999, the Waughs filed the instant lawsuit against Pathmark Stores, Inc. and several John Does, claiming racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.*, and several common law violations, arising from Ethel Waugh's employment with Pathmark.

Plaintiff Ethel Waugh has been an employee in the meat and deli departments of Pathmark's grocery store in Pleasantville, New Jersey, for nearly twenty years. (Plaintiffs' Brief at 1; Complaint ¶ 8). Ms. Waugh claims that in 1996 she began to complain of racial discrimination in the Pleasantville store to the store manager, Ron Travia, as well as to Pathmark's Southern Division Hu-

man Resources Manager, Rick McGinley. (*Id.*). She further asserts that Pathmark did not respond to these complaints. Thus, in January 1997, Ms. Waugh contacted the NAACP's Atlantic City branch for assistance. (*Id.*). As a result of this contact, on February 11, 1997, the NAACP forwarded a letter to Mr. Travia notifying him of Ms. Waugh's complaints. (*Id.*). Pathmark internally forwarded this letter to Rick McGinley, as well as to John Thomas Wynn, Esquire, one of Pathmark's in-house counsel. (*Id.*, Exhibit A). The matter was assigned for investigation to Ghislaine L. Bond, Pathmark EEO Manager.

Pathmark denies that Ms. Waugh ever complained of discrimination prior to the letter from the NAACP, although Pathmark concedes that Mr. Waugh contacted Vice President Robert Paton in January 1997 in relation to Mrs. Waugh's allegations. (Pathmark Brief at 10; Plaintiffs' Brief, Exhibit F, Response to Charge of Discrimination). Both Mr. Wynn and Mr. McGinley followed up with Ms. Bond on the development of her investigation. (Plaintiffs' Brief, Ex. A). Most significantly for the purposes of this motion, Mr. Wynn sent Ms. Bond an e-mail on March 5, 1997, inquiring into the status of the investigation. The e-mail states in full:

Subject: NAACP and Waugh

William Marsh's letter of 2/11/97 has been referred to me by Marc S. Please contact me to advise me of the status of this matter asap.

Thanks.

(P's Brief, Exhibit A, P–29).

Ms. Bond concluded her investigation on or about May 14, 1997, (*id.* at 2), at which time she reported her findings during a meeting with certain Pathmark employees. (*Id.* at 2, Exhibit B). The employees present at this May 14th meeting were Rick McGinley, Pathmark Southern Division HR Manager, Grant McLaughlin, Pathmark VP of Marketing and former Regional Manager, and Mr. Wynn. (*Id.*).

The plaintiffs contend that these two contacts with Ms. Bond related to the investigation—the e-mail to Ms. Bond requesting status on the Waugh matter and the attendance at the May 14 meeting—convert Mr. Wynn's involvement in the matter from that of legal advisor to that of participant and decision maker. In the alternative, the plaintiffs contend that Pathmark's defense interposed in this litigation that Pathmark conducted a prompt and reasonable investigation and remediation of Plaintiff Ethel Waugh's complaints effectively waives any attorney-client privilege claims related to Mr. Wynn's involvement in the Waugh matter specifically as it relates to Pathmark's remediation. Consequently, the plaintiff seeks to depose Mr. Wynn on the subject of the remediation related to Ms. Waugh and to obtain documents produced by Mr. Wynn on this subject.

Pathmark opposes any deposition of Mr. Wynn or production of his written materials on the ground that Mr. Wynn acted only as a legal advisor in the strict sense, and that his materials are protected by the attorney-client privilege, as codified in Fed.R.Evid. 501. Pathmark proffers a certification of Mr. Wynn in support of this position. (*See* Plaintiffs' Brief, Ex. H). Mr. Wynn has certified to this court that he was "consulted by Pathmark employees, as an attorney, for legal advice in connection with the results of the investigation, and specifically, the discipline being imposed upon two Pathmark employees, Joseph Nardo and Ronald Travia. I only offered my legal advice as an attorney for Pathmark. I did not make any decisions as to the discipline imposed, or any decisions as to the remedial action to be instituted following the investigation." (*Id.*, ¶ 4). Mr. Wynn further certified that:

During and after I was consulted following Ms. Bond's investigation, I did not make any decisions as to whether Plaintiff Ethyl (sic) Waugh should be promoted to a department manager position within Pathmark. As noted above, any such decision would have exceeded the scope and limit of my job responsibilities.

(*Id.*, Ex. H, ¶ 6). Moreover, Pathmark has represented that it does not intend to rely upon Mr. Wynn's advice as part of its defense that it conducted a prompt and reasonable investigation and remediation of the al-

legations of discrimination. (Pathmark Brief at 1, 16).

## III. DISCUSSION

### A. The Attorney–Client Privilege

The Federal Rules of Civil Procedure allow parties to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ... if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

■■■ The privileges noted in Rule 26(b)(1) are encompassed in Rule 501 of the Federal Rules of Evidence. Rule 501 states that the application of any claimed privilege is governed by the common law, unless otherwise provided by the Constitution or other federal statute.[1] In cases premised upon both federal and state law, as is the case here, federal common law governs the evidentiary privileges, rather than state law. *Harding v. Dana Transport, Inc.*, 914 F.Supp. 1084, 1090 (D.N.J.1996) (citing *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 671 F.2d 100, 103 (3d Cir.1982)). The party claiming the privilege has the burden of establishing that the privilege applies. *Id.* at 1089–90.

■ The United States Supreme Court has recognized that the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); *see also In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir.1979) ("the attorney-client privi-

lege exists to foster disclosure and communication between the attorney and the client"). No bright-line rule governs the applicability of the attorney-client privilege and, as a result, the applicability of the privilege should be determined on a case-by-case basis. *Upjohn*, 449 U.S. at 396–97, 101 S.Ct. at 686. The Third Circuit has enumerated the traditional elements of the privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation*, 599 F.2d at 1233 (quoting *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)). Courts have found that "because the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *Harding*, 914 F.Supp. at 1091 (quoting *In re Grand Jury Investigation*, 599 F.2d at 1245).

### B. The Attorney–Client Privilege in Investigation of Employment Discrimination

Although the plaintiff relies upon the New Jersey Supreme Court decision of *Payton v. New Jersey Turnpike Authority*, 148 N.J.

---

1. Fed.R.Evid. 501 states in pertinent part:

   Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the

   United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

524, 691 A.2d 321 (1997), for determination of the applicability of the attorney-client privilege in this matter, federal, and not state law, applies in this case premised upon both federal and state law claims. *See supra. Payton* is, however, entirely applicable with respect to the statement of the law in New Jersey governing the relevance of information sought in discrimination litigation, the burden of proof and production placed upon both the plaintiff and defendants, and the scope of the defenses interposed by the defendants. Neither this court nor the defendants disagree with the plaintiff's recitation of the substantive law governing discrimination. Thus, *Payton* controls this court's decision on that basis alone.

This court considered the discoverability of attorney product related to an internal investigation of discrimination in *Harding v. Dana Transport*, 914 F.Supp. 1084 (D.N.J.1996). There the court considered whether an attorney, hired by an employer to both investigate internal complaints of discrimination and defend the employer against those complaints in related litigation, must submit to both a deposition and disclosure of his documents. The *Harding* employer defended a complaint of sexual harassment discrimination with the defense of a reasonable and prompt investigation, as articulated in *Lehmann v. Toys 'R' Us*, 132 N.J. 587, 626 A.2d 445 (1993). After reviewing the history of the privilege, and the substantive claim alleged, the *Harding* court ordered the defendant to produce the attorney for deposition. The court found that the employer had waived his right to assert attorney client protection because the employer had placed the attorney's knowledge at issue.

*Payton* reconfirmed the New Jersey courts' adherence to the *Lehmann* interpretation of an employer's duties under the New Jersey Law Against Discrimination. *Payton*, 148 N.J. at 538, 691 A.2d 321. Moreover, the United States Supreme Court has recently rendered such information relevant in its *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), decision. There the Court held that an employer may defend a claim of discrimination under Title VII, where no tangible detrimen-

tal employment action has been taken, by asserting that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662. Thus, the *Harding* analysis applies equally to the case *sub judice*.

The plaintiff recites a litany of factual information to which Mr. Wynn became privy concerning Ms. Waugh and her charge of discrimination. However, neither Mr. Wynn's assignment to the case by Pathmark nor his presence at a meeting discussing the results of an internal investigation necessitate a finding of participation as a business person in the decision making process such that his advice should be subject to disclosure. Employers maintain staff attorneys for a number of reasons, not the least of which is the cost benefit. The most efficient use of an employer's management team is to dispense relevant information to more than one person at a time to the greatest extent possible, maintaining the necessary confidentiality. Utilizing this method both conserves time and negates the whisper-down-the-lane effect.

■ The parties' submissions reveal only that Mr. Wynn attended a meeting with Ms. Bond and certain Pathmark decisionmakers in which Ms. Bond reported her findings, and that Mr. Bond rendered advice concerning the remediation following the investigation of Ms. Waugh's complaints. The submissions further reveal that Mr. Wynn reviewed the documents relevant to Ms. Waugh's charges of discrimination. The facts before this court confirm the defendants' position that Mr. Wynn reviewed these documents and attended these meetings merely in his capacity as an attorney for Pathmark, and in order to generate a *legal opinion* with respect to the Waugh situation. According to the facts before this court, Wynn did not conduct interviews and did not render disciplinary determinations: Wynn did not act as a participant in the investigation or a decisionmaker in the remediation Pathmark effectuated.

■ It appears to be the plaintiffs' position that, like the process of investigation, the *process* of remediation should be open to discovery, including any advice sought by an employer on the actual remediation to be taken. This position does not take into account, however, the purpose of the attorney-client privilege: "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice. The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Harding*, 914 F.Supp. at p. 1091. Here, Pathmark sought advice from an attorney regarding the actual remedial steps to be taken. However, Pathmark has not pointed to the attorney as the source for the remedial decision. Rather, Pathmark has provided voluminous discovery from the actual decisionmakers at Pathmark, upon whose decision Pathmark relies as a defense to this litigation.

■ Accordingly, this court is not concerned that Mr. Wynn may be present during Ms. Bond's reporting of the investigation results. Mr. Wynn was assigned by Pathmark to the Waugh matter to provide legal advice on the issue of racial harassment and discrimination. This advice can be dispensed only after Mr. Wynn had been apprised of the relevant factual background. Ms. Bond was the most direct link to this information and the May 14 meeting the most efficient and timely place to discover the information. Moreover, under both state and federal law (*see Payton*, 148 N.J. at 537–38, 691 A.2d 321, and *Faragher*, 524 U.S. at 807–808, 118 S.Ct. 2275), an employer must strive to respond to charges of discrimination and take reasonable corrective measures promptly. This court would work a disservice upon both the statutory scheme, as interpreted by the courts, and the employer's efforts to adhere to that scheme, if this court prevented an employer from allowing its in-house counsel to attend factual discussions related to charges of discrimination.

Although not controlling, *Payton* does provide additional support for the position that the information has not been placed at issue. As the plaintiff notes, *Payton* stands for the proposition that where an attorney conducts an investigation for some purpose other than preparing for litigation or providing legal advice, the attorney-client privilege is inapplicable. *Payton*, 148 N.J. at 551, 691 A.2d 321. Here, the plaintiff has provided this court with no information that Wynn did anything other than provide advice on the subject of employment decisions. The defendant did not, as was the case in both *Harding* and *Payton*, retain an attorney for the purpose of **conducting** the investigation. *See Harding*, 914 F.Supp. at 1096; *Payton*, 148 N.J. at 550–51, 691 A.2d 321.

The plaintiff contends that the privilege is not applicable since Wynn received no confidential privileged communications from Ms. Bond. (Reply Brief at 7, citing *Pray v. New York City Ballet Co.*, 1997 WL 266980 (S.D.N.Y.1997)). The plaintiff, however, misunderstands the scope of the attorney client privilege. Even in *Harding*, where Defendant Dana Transport had clearly retained an attorney to perform the sexual harassment investigation, this court recognized nevertheless that some of the communication between the attorney and the defendant were protectable by the attorney-client privilege. Thus, this court ordered that certain of the documents be redacted to protect those communications. *Harding*, 914 F.Supp. at 1104. In the instant matter, there is no evidence before this court that Mr. Wynn conducted the investigation or that he was a decisionmaker. Mr. Wynn was merely present at the May 14, 1997 meeting to gather information so that he could render a legal opinion on the issue to the actual decisionmakers. If Pathmark had wished to rely upon Mr. Wynn's advice to support the reasonableness of its investigation or remedial measures taken, this court would order the information disclosed. However, Pathmark has declined to rely on Mr. Wynn's input in this way, that is, Pathmark has not put the advice of Mr. Wynn at issue. Consequently, there is no basis for a waiver of the attorney-client privilege.

The plaintiffs rely upon another Southern District of New York case, *Sealy v. Gruntal & Company*, 1998 WL 698257 (S.D.N.Y.

1998). There the court considered whether an attorney should be deposed and ordered to produce documents relevant to a sexual harassment complaint. The court ordered a limited deposition of the attorney involved. However, like *Harding* and *Payton*, the discovery was ordered because the attorney **actually conducted part of the investigation.** That is not the case here. Mr. Wynn did not conduct any part of the investigation. He did sit in on a factual discussion concerning the results of the investigation. However, his attendance at the meeting was merely in furtherance of his duties as an attorney, not in the capacity of a decisionmaker or investigator. And, again, Pathmark has represented that it will not refer to the participation of Mr. Wynn in any way as related to its defense of a prompt and reasonable investigation or remediation.

## IV. CONCLUSION

The plaintiff has provided absolutely no testimony to support the allegation that Wynn was present to make business decisions or to conduct an investigation. Rather, Wynn merely offered precisely the type of legal counseling traditionally protected by the attorney-client privilege. Further, there is no basis for a waiver of the privilege under either the *Payton* or *Harding* decisions, as Pathmark has forsworn reliance on Mr. Wynn's advice to support its claim of prompt and reasonable investigation or remediation of allegations of racial harassment. Nevertheless, this court shall bolster and cement that representation by Pathmark's counsel by including in the attached order a prohibition against Pathmark's use or reference to Mr. Wynn's advice or participation in the investigation or remediation process, either directly or indirectly, in the instant litigation.[2] This prohibition includes both dispositive motion practice and trial conduct. Yet, the court also forewarns the plaintiffs that should they open the door by themselves referring to the advice or participation of Mr. Wynn, the defendants may be permitted to meet that testimony.

The current employment landscape presents a minefield of legal issues, requiring employers to carefully consider every managerial step. This is particularly and devastatingly so in the complex area of discrimination and racial harassment. The position the plaintiff urges here today would effectively preclude employers from eliciting advice from an attorney prior to making employment decisions. More importantly, however, this court rejects the plaintiffs' position as it would gut the attorney client privilege—unnecessarily sacrificing a central and essential tenet of the American system of justice. This court does not understand the purpose of either the New Jersey Supreme Court's *Payton* decision, or this court's *Harding* decision, to force this draconian a result.

---

2. Pathmark's submissions confirm that Pathmark does not intend to rely upon the Wynn consultation in general. (Pathmark Opposition Brief at 2, 16). And, Pathmark goes one step further to

confirm that it does not "plan[ ] to cite to the mere fact that an attorney was consulted as a way to buttress the validity of its investigation defense." (*Id.* at 10, 16).